785 So.2d 34 (2001)
STATE of Louisiana
v.
Raymond G. SHAW.
No. 00-KA-1051.
Court of Appeal of Louisiana, Fifth Circuit.
February 14, 2001.
*36 Bruce G. Whittaker, Louisiana Appellate Project, New Orleans, LA, Counsel for Raymond G. Shaw, Defendant-Appellant.
Paul D. Connick, Jr., District Attorney, 24th Judicial District, Parish of Jefferson, State of Louisiana, Thomas J. Butler, Terry M. Boudreaux, Assistant District Attorneys/Appellate Counsel. David P. Wolff, Assistant District Attorney/Trial Counsel, *37 Gretna, LA, Counsel for the State of Louisiana, Plaintiff-Appellee.
Panel composed of Judges DUFRESNE, CANNELLA and CHEHARDY.
SUSAN M. CHEHARDY, Judge.
Raymond G. Shaw appeals his conviction by a jury of attempted first degree murder, a violation of La. R.S. 14:27 and La. R.S. 14:30. He also appeals his sentence of fifty years at hard labor without benefit of probation, parole or suspension of sentence.
On September 23, 1998 the Jefferson Parish District Attorney filed a bill of information charging Raymond G. Shaw with violation of R.S. 14:27:30, in that he attempted to commit first degree murder of Cynthia Lamparski on or about the third day of August, 1998. On October 1, 1998 he was arraigned and entered a plea of not guilty.
Subsequently defense counsel requested appointment of a sanity commission. On January 28, 1999, following a hearing, the trial court found the defendant incompetent to proceed and ordered that he received jail-based instruction in his legal rights. The defendant was re-evaluated on May 13, 1999 in a hearing that continued over to May 20, 1999. The court again determined that he was incompetent.
On July 8, 1999 the defendant was brought before the court again, re-evaluated, and was found competent to proceed at trial. Defense counsel orally changed the defendant's plea from not guilty to not guilty and not guilty by reason of insanity. Defendant filed a written motion to change the plea on July 20, 2000 and the motion was granted on that date.
The defendant subsequently filed a motion to suppress confession, identification, and physical evidence. After a hearing the motion to suppress was denied.
Jury selection began on January 24, 2000 and continued into the next day. The first witness was sworn on January 25, 2000. The presentation of evidence continued on January 26 and concluded on January 27. On January 27, 2000 the jury returned a verdict of guilty as charged, by a margin of eleven to one. The court declared the verdict legal and ordered it recorded. The defendant made an oral motion for appeal.
On February 2, 2000 the defendant filed a written motion for new trial. After a hearing, the motion for new trial was denied on February 4, 2000. The defense requested a forty-eight hour delay in sentencing, but the court denied the delay and proceeded to impose sentence. The defendant was sentenced to imprisonment at hard labor for a term of fifty years, without benefit of parole, probation or suspension of sentence, with credit for time served.
The defendant made an oral motion to reconsider sentence, which was denied. On that same date the defendant filed a written motion to reconsider sentence on the ground of excessiveness, which was denied on February 7, 2000. Thereafter the defendant filed a written motion for appeal.

FACTS
The State's first witness was Martin Watson. He testified that on August 3, 1998, the defendant and Cynthia Lamparski came to his home to spend the night. The defendant and Lamparski sat with Watson in his living room and drank beer. Watson later went to bed, leaving the defendant and Lamparski in the living room.
After Watson went to sleep, he was awakened by his dog's barking. Watson *38 went into the living room and saw that Lamparski was on fire. He saw the defendant standing over her, but the defendant was doing nothing to help her. She called to Watson for help and he began to throw water on her. While Watson attempted to put out the fire on Lamparski, the house began catching fire.
The defendant left the house. Watson ran outside and told a neighbor to keep an eye on the defendant, not to let him get away. Watson then went around the side of his house to get a hose to put out the fire on Lamparski, but the hose was too short. When he came back to the front he noticed that neighbors had begun to hose off Lamparski and to put blankets on her. Watson then tried to rescue his dog from the bedroom by breaking the window with his arms, but he severely cut his elbows and severed an artery. A neighbor helped to try and stop the bleeding until aid arrived.
Watson said that the living room, hallway and front bedroom of his house were burned, all the way back to the bedroom where the dog was in back. Watson also testified that on the night of the fire he had a red gas can containing gasoline by the pantry, close to the kitchen. He said he had used the gasoline to cut grass earlier and was too tired to return the can to the utility room.
On cross examination Watson stated he had known the defendant for about a year and had never seen him get violent. He also said that Lamparski had cooked earlier, that he had eaten with them, and that they had finished before he went to bed. He recalled that the defendant and Lamparski had a little argument, when the defendant said something about "Cathy," and Lamparski said, "I'm not Cathy. My name is Cindy." When he went to bed, the defendant and Lamparski were lying on the sofa cushions on the floor over by the window.
Sergeant James Wine of the Jefferson Parish Sheriff's Office testified that on August 3, 1998 he responded to a dispatch regarding a house fire at 2553 Jeanne Street (Watson's address). As Wine was driving to the scene, he noticed a subject later identified as the defendant half-walking, half-running the opposite way. The man was wearing green shorts. When Wine arrived at the scene, he observed that the structure was fully engulfed. He observed an injured black male lying on the drivewray across the street in a large pool of blood and a group of people around a female dumping water on her. As a result of conversation with some of the witnesses on the scene, Wine left to find the defendant.
Wine located the defendant several blocks from the house and stopped him. Wine noticed burns on the defendant's hands and upper chest. Wine observed that the defendant was sweating profusely, kept looking back toward Jeanne Drive, and was moving in a half-walk half-run pace. Wine said that the defendant told him, "She poured gas on me and lit me on fire."
Wine returned with the defendant to the house, where two witnesses identified the defendant as the man they saw leaving Watson's house.
Wine said that the defendant initially did not appear to be intoxicated, but after Wine placed the defendant in his car the smell of alcohol began to permeate the car. The defendant was transported to West Jefferson Hospital.
Sergeant Terry Graffeo of the Jefferson Parish Sheriff's Office testified that on August 3, 1998, he was informed of the house fire involving a burned female. He went to West Jefferson Hospital, where he supervised *39 seizing of evidence, including the victim's clothing, the defendant's clothing, and a lighter found in the defendant's pocket. Graffeo said that the victim's gray shorts had a strong smell of petroleum material, possibly gasoline. He noticed nothing unusual about the defendant's shorts.
Investigator Thomas Lowe, an arson investigator for the Jefferson Parish Fire Department, was accepted by the court as an expert in the field of cause and origin of fires and in arson investigation. Lowe testified he investigated the house fire at 2553 Jeannne. He found that the right side of the house was severely burned. Lowe found no accelerants. He noted that the room had no carpet or padding, which would have absorbed the accelerants, and that without carpet and padding, any accelerant usually burns up in the fire.
Lowe described the difference between fire burns and flashback burns. He said that with flashback, there is even, radiated heat on the exposed parts of the body, shown by redness and peeling; with burns from trying to put out a fire, only certain areas are burned. With flashback the areas closest to the ignition point will be more damaged. Lowe testified that the defendant's burns were consistent with flashback, which occurs when lighting gasoline, because the skin from his fingertips on back was peeled back like a glove. Lowe said that is a direct indication of flashback because it was the heaviest area of heat force coming back.
Lowe testified further that he determined the flashback was consistent with at least sixteen ounces of gasoline, which was the minimum needed to get the sofa on fire and get Lamparski's hair and clothing. However, he said probably a lot more was used because a lot more was necessary for it to become sufficiently vapor-rich to cause the flashback.
The victim, Cynthia Lamparski, testified that the defendant was her boyfriend at one time and that their relationship lasted approximately nine months. They lived together in Franklinton. On August 2, 1998, Lamparski told the defendant that they should break up. The defendant suggested to Lamparski that they go to his mother's house the next day and try to work it out; otherwise, they would go their separate ways.
Lamparski said that the next day, August 3, 1998, the defendant's mother picked them up and drove them to her home in Marrero. During the day, the defendant and Lamparski bought a twelve-pack of beer and the defendant drank four beers. The defendant's mother saw the defendant with a beer and told the defendant and Lamparski that they had to leave. The defendant's mother took them to Watson's house.
Lamparski testified that after they arrived at Watson's house, the defendant had another beer. Watson told the couple that they could take the cushions off the sofa and make a bed. Lamparski laid the cushions out and then cooked some noodles. While Lamparski was cooking, the defendant began to call Lamparski "Cathy," the name of his former girlfriend. The two began to argue. After they argued, the defendant told Lamparski that he did not want to fight anymore and she walked up to him, thinking they were going to make up.
As she approached, the defendant punched her in the lower part of her stomach. She fell to her knees and heard the defendant say, "If I can't have you, no one else will." The defendant grabbed her by the hair and she felt something wet on her back. Lamparski saw that the defendant had a gas can and was pouring gas on her. *40 The defendant then lit the gas with a yellow Bic lighter.
She pleaded, "Raymond, help me, please," but he just stood there and looked at her. She started screaming and tried rolling to put the fire out. The defendant began to pour the gas on the curtains and on the wall of the house. Watson came into the room and asked what was going on. Lamparski ran out of the house, screaming for help. She was in flames all over. She ran to a neighbor across the street who used a hose to put the fire out.
Lamparski had second- and third-degree burns over eighty-five percent of her body. She first taken to West Jefferson Hospital and transferred to Baton Rouge Medical Center, where she spent five months in the burn unit, the first twenty-eight days of which she was on life support due to lung damage from the gasoline and fire. She underwent tube-feeding for five months after the accident. By the time of trial Lamparski had undergone twenty-five operations.
On cross-examination Lamparski stated that during the nine months she lived with the defendant prior to the fire, he never hit her or got physical with her in any way and never threatened to do any harm to her.
Detective Daniel Waguespack of the Jefferson Parish Sheriffs Office was accepted as an expert in the field of forensic chemistry, specifically in the identification and analysis of arson-related substances. Waguespack stated that the shorts Lamparski was wearing on the night of the fire tested positive for the presence of weathered gasoline. Weathered gasoline indicates that the gasoline was allowed to sit in the open or was partially burned. Waguespack further testified that the shorts the defendant was wearing on the night of the fire were negative for accelerant.
Patricia Shaw testified on behalf of her son, the defendant. She stated that on the morning of August 3, 1998 she picked up the defendant and Lamparski in Kenner, where they had been staying with the defendant's brother. She drove them to Franklinton so Lamparski could pick up a check at the post office. After picking up the check and eating breakfast, they stopped at a drug store for Lamparski to have a prescription filled. While they were stopped, the defendant and Lamparski bought two quarts of beer. The defendant and Lamparski drank the beer in the car.
When they stopped for gas later, Lamparski bought more beer. At this point, Mrs. Shaw told them they could not stay at her house if they were drinking.
After they arrived at Mrs. Shaw's house; the defendant and Lamparski left to get cigarettes. When they returned home they had a six-pack of beer. Mrs. Shaw stated they were both drunk and had slurred speech and a staggering walk. She told them that they could not stay at her house. She then took them to Watson's house.
On cross-examination Mrs. Shaw admitted she was aware of several episodes of violent behavior by her son in his relationship with his former girlfriend, Cathy.
The defendant then called Dr. Daphne Glindmeyer, who was accepted as an expert in forensic psychiatry. She testified that she examined the defendant and prepared an evaluation. Glindmeyer testified that at the time of the crime the defendant had a diagnosis of schizoaffective disorder, bipolar type, in remission, polysubstance dependence, and acute intoxication. She opined that on the night of the incident the defendant's schizoaffective disorder was in remission. She stated that in her opinion, on the night of the fire the defendant knew the difference between right and wrong, *41 but that he was unable to appreciate the consequences of his actions.

ASSIGNMENT OF ERROR NO. 1
The trial court erred in imposing an arbitrary time limit on voir dire.
The defendant complains of the trial court's action in limiting the parties to forty-five minutes for voir dire on the second day of jury selection. When the defendant objected, the court advised counsel that they had been warned on the preceding day that the limit on the second day would be shorter.
On appeal the defendant argues that it was error for the trial court to limit his examination of jurors in this way, for the following reasons:
Appellant's case involved exceedingly complex and controversial issues concerning insanity and intoxication.... Jurors historically are very reluctant to credit the defense of insanity and take an equally jaundiced view of a defense premised in part on the accused's intoxication. The issues presented by these elements of appellant's defense voir dire were greatly complicated by the grave disfiguring injuries suffered by the victim, injuries for which the victim deserved the utmost sympathy from the jury but which made the job of defense voir dire all the more difficult and sensitive.
The record does not contain the entire voir dire. It contains only those portions of the voir dire noted by the reporter to reference a specific objection. That portion which was transcribed, however, reveals appellant's jury venire struggling with these very issues.... To the extent that the small portion of the voir dire which was transcribed parenthetically references the jurors' difficulties with appellant's modes of defense, the difficulties revealed thereby are truly just the "tip of the iceberg."
The State responds that there was no arbitrary limit of the defendant's right to fully examine the potential jurors and that the defendant failed to show an abuse of the trial court's discretion.
Our state constitution provides that the accused shall have a right "to full voir dire examination of prospective jurors and to challenge jurors peremptorily." La. Const. Art. 1, § 17(A). Furthermore, La.C.Cr.P. art. 786 states that the court, the state, and the defendant shall have the right to examine prospective jurors and that the scope of the examination shall be within the discretion of the court.
The purpose of voir dire examination is to determine qualifications of prospective jurors by testing their competency and impartiality. It is designed to discover bases for challenges for cause and to secure information for an intelligent exercise of peremptory challenges. The scope of voir dire examination is within the sound discretion of the trial judge and his ruling will not be disturbed on appeal in the absence of a clear abuse of discretion. However, although the trial judge is vested with discretion to limit the voir dire examination, he must afford wide latitude to counsel in the conduct of voir dire examination to effectuate the accused's right to full voir dire of prospective jurors embodied in La. Const. art. 1, § 17. In order to determine whether a trial judge has in fact afforded a sufficiently wide latitude to the defendant in examining prospective jurors, a review of the trial judge's rulings should be undertaken only on the record of the voir dire examination as a whole.
*42 State v. Hall, 616 So.2d 664, 668-669 (La. 1993).
"A review of the trial judge's discretionary rulings should be undertaken only on the record of the voir dire examination as a whole, or at least upon the entire record of examination of the prospective jurors during which defendant contends such prejudicial curtailment occurred." State v. Roach, 338 So.2d 621, 625 (La.1976).
In the record on appeal only portions of the voir dire were transcribed. Those transcribed portions do not show any abuse of discretion by the trial court.
In the motion for appeal the defendant moved for an order directing the clerk of court "to lodge the entire record including but not limited to all Pre Trial, Trial and Post Trial proceedings, with all testimony adduced in connection therewith, ... in accordance with C.Cr.P. art. 914.1." The trial court signed the order as phrased by the defendant.
Although the defendant requested lodging of the "entire record," this request does not expressly stipulate transcription of voir dire. The defendant notes in his brief that the voir dire transcription is incomplete, yet the defendant did not request that the record be supplemented with a transcript of the entire voir dire.
The party making the motion for appeal shall, at the time the motion is made, request the transcript of the portion of the proceedings necessary, in light of the assignment of errors to be urged. La. C.Cr.P. art. 914.1.
[A]n appellate court must render its judgment upon the record on appeal. The record on appeal is that which is sent by the trial court to the appellate court and includes pleadings, court minutes, transcripts, judgments and other rulings unless otherwise designated.
* * *
The appellant shall request the transcript or portions thereof in light of the assignments of error urged. La. C.Cr.P. art. 914.1. The appellant bears the burden of furnishing the appellate court with a record of the proceedings below.... Any inadequacy of the record is imputable to the appellant.... If a transcript, exhibits or other documentation is missing and the appellant fails to act, there is no basis for the appellate court to determine that the trial court erred.
State in Interest of Solomon, 95-0638 (La. App. 4 Cir. 3/27/96), 672 So.2d 1039, 1042-1043.
In the present case, the full voir dire was not transcribed and those portions that were transcribed show no abuse of discretion by the trial court. The defendant was aware that the record did not contain transcription of the full voir dire, yet he did not request a supplemental transcript. Although we could rely on these circumstances in finding no merit to this assignment of error, in the interest of justice this Court requested, on our own motion, supplementation of the record with the missing portion of the voir dire.
After reviewing the entire voir dire, as supplemented following our order, we find no abuse of discretion by the trial court. Despite the time limitation placed on examination of the venire during the second day of voir dire, defense counsel had sufficient scope to test the prospective jurors' competency and impartiality. This is shown by defense counsel's exercising both peremptory challenges and challenges for cause. Accordingly, we find no merit to this assignment.

ASSIGNMENT OF ERROR NO. 2
The trial court erred in prohibiting appellant from impeaching the *43 State's key witness with authenticated evidence proving that she had been diagnosed as a paranoid schizophrenic or was otherwise psychotic.
The defendant argues that the trial court erred in refusing to allow him to impeach the victim with certified documents from the Social Security Administration.
The State responds that the trial court did not err in excluding the certified documents because the court found the evidence unreliable and untrustworthy.
During the testimony of the victim, defense counsel cross-examined her as follows:
Q. Ms. Lamparski, do you have a clear recollection of what happened that night?
A. The night I was put on fire?
Q. Excuse me?
A. The night of the fire?
Q. Yes, ma'am.
A. Yes, I do.
Q. Were you suffering from any physical or mental disability that might impair your recollection at all?
A. No.
Q. Okay. Were you receiving S.S.I. for any physical or mental disability that would impair your recollection?
A. I was receiving S.S.I. for osteoarthritis.
At this point, defense counsel sought to introduce a certified document from the Social Security Administration that was an extract from the victim's SSI file, pursuant to La.C.E. art. 803(8). It states, "Cynthia Lamparski became became entitled to SSI benefits with [sic] February 1992.... The disability was established as `Schizophrenic, Paranoid & Other Functional Psychotic.'" The defendant wished to impeach Lamparski's testimony that she was not suffering from any mental disability that would impair her recollection and that she received S.S.I. benefits for osteoarthritis.
The trial court ruled that defense counsel could not cross-examine the victim based on the document.
On appeal, the defendant contends that because the testimony of the victim was "absolutely essential" to the State's case, questioning her credibility became equally important to the defense. The defendant argues that the trial court's refusal to allow him to cross-examine the victim on the document violated his Constitutional rights to confront the witnesses against him.
The Sixth Amendment of the U.S. Constitution and Article I, § 16 of the Louisiana Constitution guarantee an accused in a criminal prosecution the right to present a defense. Washington v. Texas, 388 U.S. 14, 87 S.Ct. 1920, 18 L.Ed.2d 1019 (1967); State v. Hamilton, 441 So.2d 1192 (La.1983). These constitutional provisions also guarantee the accused the right to confront the witnesses against him.
The essential purpose of confrontation is to secure for the opponent the opportunity of cross-examination. Davis v. Alaska, 415 U.S. 308, 315-16, 94 S.Ct. 1105, 1109-1110, 39 L.Ed.2d 347 (1974). Cross-examination is the primary means by which the believability of a witness and the truth of his testimony are tested. State v. Hillard, 398 So.2d 1057, 1059 (La.1981).
In this case, the defendant sought to cross-examine the victim on an authenticated document from the Social Security Administration, pursuant to the public records exception to the hearsay rule set out in La.C.E. art. 803(8). That article states in pertinent part:

*44 The following are not excluded by the hearsay rule, even though the declarant is available as a witness:
* * *
(8) Public records and reports. (a) Records, reports, statements, or data compilations, in any form, of a public office or agency setting forth:
(i) Its regularly conducted and regularly recorded activities;
(ii) Matters observed pursuant to duty imposed by law and as to which there was a duty to report; or
(iii) Factual findings resulting from an investigation made pursuant to authority granted by law. Factual findings are conclusions of fact reached by a governmental agency and may be based upon information furnished to it by persons other than agents and employees of that agency.
(b) Except as specifically provided otherwise by legislation, the following are excluded from this exception to the hearsay rule:
(i) Investigative reports by police and other law enforcement personnel.
(ii) Investigative reports prepared by or for any government, public office, or public agency when offered by that or any other government, public office, or public agency in a case in which it is a party.
(iii) Factual findings offered by the prosecution in a criminal case.
(iv) Factual findings resulting from investigation of a particular complaint, case, or incident, including an investigation into the facts and circumstances on which the present proceeding is based or an investigation into a similar occurrence or occurrences.
La.C.E. art. 803(8).
As the State points out in its brief, the Historical Notes in the annotations following Article 803 include the following comments to Exception (8), in pertinent part:
Under the "factual findings" category of Part (iii) of Subparagraph (a), ... there may be circumstances where findings may be included within the public records exception even though based on facts related to an agency by non-agency personnel. In such cases the findings should be admitted only when the underlying evidence on which they are based appears to have been trustworthy.... A related problem is created when a factual finding contains evaluative statements such as expert opinions. In such cases the evidence should be admitted only if the person who expressed the opinion is found to have had the proper qualifications. When factual findings are offered it is appropriate for the trial court to require a foundation. In other words, courts must be particularly sensitive to the trustworthiness vel non of factual findings.
La.C.E. art. 803(8), Comment (d) to Exception (8)-1988.
The "public documents" exception to the rule against hearsay is historically based upon the principles of necessity and the probability of trustworthiness. State v. Nicholas, 359 So.2d 965, 968 (La. 1978). With the creation of the Code of Evidence by Acts 1988, No. 515, § 1, eff. Jan. 1, 1989, the principle was embodied in Article 803(8).
Art. 803(8) ensures the trustworthiness of public records sought to be introduced as evidence in a criminal proceeding by distinguishing between those records reflecting basic factual *45 information and prepared during the course of a government agency's regular activities or duties, and those records which reflect conclusions or inferences drawn from such basic factual information. The former category of records is admissible as evidence in a criminal proceeding, while the latter category is not admissible. This distinction further safeguards the criminal defendant's confrontation rights as guaranteed by the Sixth Amendment to the United States Constitution and Article 1, Section 16 of the Louisiana Constitution of 1974.
State v. McCullough, 566 So.2d 635, 637 (La.App. 5 Cir.), writs denied, 571 So.2d 645 (La.1990) and 584 So.2d 1141 (La. 1991).
As a general rule, hearsay evidence should be excluded. La.C.E. art. 802. However, "normally inadmissible hearsay may be admitted if it is reliable, trustworthy and relevant, and if to exclude it would compromise the defendant's right to present a defense." State v. Van Winkle, 94-0947 (La.6/30/95), 658 So.2d 198, 202. Nevertheless, the right to present a defense does not require a trial court to permit the introduction of evidence that is irrelevant or has so little probative value that it is substantially outweighed by other legitimate considerations in the administration of justice. State v. Ludwig, 423 So.2d 1073, 1079 (La.1982).
In the present case, the trial court stated extensive reasons for denying the defendant's request to use the document to impeach the victim:
Well, I'm going to rule without her maybe. Factual findings-let me see the social security thing again-as opposed to conclusions. Also talks about whether or not it's done in the first person or whether it's on someone else, and it also talks about trust-worthiness. When I look at these records, they are extremely sketchy. They say they are an extract. The actual report is eight short lines long. It doesn't say who made that determination. It doesn't say what their qualifications were. It doesn't say whether it was a doctor, lawyer, or Indian chief who made that. It doesn't give me the history. It doesn't tell me whether there has been anything since 1992 that would change this. There are some ... I mean, if she gets these every month, that even is not clear in here. I don't know what the numbers mean. There is-on the last page, it saysI'm looking atit says "11-01-95." The next number is a nine, and then it's an "N," then there's another "11-01-95" with a six and an "N" and a "S" after that. I have no idea what any of that means. It looks like she got two payments on the same date. I can't tell that. Then she didn't get-then she gets 12-01-95, 1-01-96, then not another one until 1-01-97, another one till 1-01-98, another one 1-01-99. Does she only get them once a year? If she only gets them once a year, why does she only get them once a year? This is about as untrustworthy as anything I can find. I am not going to allow you to use it.
The defendant sought to use the document to impeach the victim's testimony. The fact that the document is used for impeachment changes the standards for its use.
Hearsay is a statement made out of court offered as evidence in court to prove the truth of the matter asserted by the statement.... Hearsay is excluded because the value of the statement rests on the credibility of the out-of-court asserter who is not subject *46 to cross-examination and other safeguards of reliability.... In order to fall within the definition of hearsay, the statement must be offered to prove the truth of the statement's contents.
State v. Everidge, 96-2665 (La.12/2/97), 702 So.2d 680, 685.
In this case, the defendant sought to question the victim on the document concerning the reasons why she received S.S.I. benefits. It appears the question should have been allowed for that purpose as impeachment. See State v. Everidge, supra. However, the document itself should not have been admitted because it includes an expert opinion of the victim's condition without any indication of the qualifications of the person that made the diagnosis.
The next step is to examine whether the error was harmless and whether it created reversible error.
Appellate courts should not reverse convictions for errors unless the accused's substantial rights have been violated. State v. Johnson, 94-1379 (La.11/27/95), 664 So.2d 94, 100. This comports with the general theory that "appeals in criminal cases are not granted merely to test the correctness of the trial court's ruling, but only to rectify injuries caused thereby." Id., citing State v. Saia, 212 La. 868, 33 So.2d 665, 668 (1947), quoting from State v. Cullens, 168 La. 976, 123 So. 645, 648 (1929).
The harmless error inquiry "is not whether, in a trial that occurred without the error, a guilty verdict would surely have been rendered, but whether the guilty verdict actually rendered in this trial was surely unattributable to the error." State v. Johnson, 664 So.2d at 102, quoting Sullivan v. Louisiana, 508 U.S. 275, 113 S.Ct. 2078, 124 L.Ed.2d 182 (1993). (Emphasis in original.)
In this case, the trial court's refusal to allow cross-examination of the victim on the document was harmless error. In addition to the victim's testimony, there was enough other evidence that the defendant was the perpetrator. The evidence showed that the victim's grey shorts had gasoline on them, but the defendant's green shorts did not. Watson testified that he saw the victim on fire and saw the defendant standing over her as she burned. There was also expert testimony that the defendant's burns were consistent with backflash caused by lighting gasoline, rather than being burned by gasoline on his skin. Accordingly, the jury's verdict was not attributable to the trial court's refusal to allow cross-examination using the SSI document.

ASSIGNMENT OF ERROR NO. 3
The trial court erred in imposing sentence without honoring the 24-hour delay mandated by law.
The defendant argues that his sentence should be vacated and the case remanded to the trial court for re-sentencing because the trial court failed to observe the 24-hour delay between denial of his motion for new trial and sentencing, as required by La.C.Cr.P. art. 873. The State concedes that the trial court failed to observe the delay and that the proper remedy is to remand this case to the trial court for resentencing.
La.C.Cr.P. art. 873 provides:
If a defendant is convicted of a felony, at least three days shall elapse between conviction and sentence. If a motion for a new trial, or in arrest of judgment, is filed, sentence shall not be imposed until at least twenty-four hours after the motion is overruled. If the defendant expressly *47 waives a delay provided for in this article or pleads guilty, sentence may be imposed immediately.
The trial court denied the defendant's motion for new trial in open court on February 4, 2000. After the denial of the new trial motion, defense counsel requested a delay prior to the imposition of sentence, which was denied. The trial court then sentenced the defendant to imprisonment at hard labor for a term of fifty years without benefit of parole, probation or suspension of sentence.
Although La.C.Cr.P. Art. 873 unequivocally requires the trial court to delay imposition of sentence for a period of at least 24 hours after denial of post-trial motions, where no objection has been raised regarding the sentence imposed and there is no showing or suggestion that defendant was prejudiced by the failure to observe the delay, judicial efficiency dictates that the appellate court need not follow the useless formality of remanding for reimposition of a sentence which has not been challenged. State v. White, 404 So.2d 1202, 1204 (La.1981).
However, the result is different when the delay was not observed and a defendant challenges his sentence. "Constitutional excessiveness of sentence and illegal imposition of sentence are separate and distinct matters. A sentence illegally imposed, even one not constitutionally excessive, is null, and constitutes no valid premise for continued incarceration." State v. Augustine, 555 So.2d 1331, 1334 (La.1990).
Where the record does not disclose any waiver of the twenty-four hour delay in sentencing after denial of a motion for new trial and it is clear that less than the mandatory delay elapsed at the time of the sentencing, the sentence is void, since imposed before expiration of the twenty-four hour delay and without waiver of same. State v. Hampton, 274 So.2d 383, 384 (La.1973). The appropriate remedy is to set aside the sentence and remand the case for re-sentencing in conformity with the law. Id.
The defendant claims that the sentence imposed is excessive. There is no waiver of the sentencing delay in the record. Accordingly, we vacate the sentence and remand the matter to the trial court for re-sentencing. See State v. Reyes, 98-424 (La.App. 5 Cir. 12/29/98), 726 So.2d 84, writ denied, 99-1474 (La.10/8/99), 750 So.2d 967.
Considering our determination of Assignment of Error No. 3, we pretermit discussion of Assignment No. 4 (excessive sentence) as moot. Similarly, we omit discussion of Assignment No. 5 (patent error), because the only patent error concerns a sentencing matter that is made moot by our setting aside the sentence.
For the foregoing reasons, the defendant's conviction is affirmed, but his sentence is vacated and the case is remanded for re-sentencing in accordance with law.
CONVICTION AFFIRMED; SENTENCE VACATED; CASE REMANDED.