WINDHORST, J.
Defendant, Daniel Beckley, appeals his convictions and sentences for second degree murder and obstruction of justice, asserting that the evidence was insufficient to support his convictions and that the appellate record is incomplete. For the following reasons, we affirm defendant's convictions and sentences.
FACTS AND PROCEDURAL HISTORY
Defendant was indicted by a grand jury on September 29, 2017 and charged with the second degree murder of Jorion White ("Miss White" or the "victim") in violation of La. R.S. 14:30.1 and obstruction of justice in violation of La. R.S. 14:130.1(A)(1)(a). Defendant pled not guilty, waived his right to a jury trial and proceeded to trial before the trial judge on October 10-13, 2017. After trial, the trial judge found defendant guilty as charged. On November 7, 2017, defendant filed a Motion for New Trial and a Motion for Post-Verdict Judgment of Acquittal, both of which were denied.
On December 12, 2017, the trial judge sentenced defendant to life imprisonment at hard labor without benefit of parole, probation, or suspension of sentence for the second degree murder conviction and imprisonment at hard labor for thirty years without benefit of parole, probation, or suspension of sentence for the obstruction of justice conviction, with the sentence imposed for obstruction of justice to be served consecutively to the sentence imposed for second degree murder. Defendant filed a Motion for Reconsideration of Sentence, which was denied.
*506 Defendant's convictions are based on the following facts. On April 22, 2016, Michelle Price and defendant, Ms. Price's live-in boyfriend of nine years, went to the Kenner Police Department (KPD) and reported that Miss White, Ms. Price's sixteen-year-old daughter, was missing from their home in Kenner. They advised Deputy Gabriel Castro that defendant had last seen Miss White at home that morning at approximately 2:45 A.M., and that she was not at home when he returned at 3:15 P.M. Deputy Castro testified that defendant pulled him off to the side and told him that Miss White was known to associate herself with alleged drug dealers. The deputy subsequently advised Ms. Price and defendant that Miss White would be entered into the National Crime Information Center database as a runaway juvenile. Deputy Castro noted that Ms. Price appeared to be calm, but that defendant looked nervous and uneasy.
Miss White's body was found on April 24, 2016 by a family that spotted a nude body in the ditch on St. Rose Avenue in St. Charles Parish. They pulled over and called 9-1-1. After confirming that there was a body in the water, Deputy Randolph McClendon of the St. Charles Parish Sheriff's Office (SCPSO) informed dispatch that there was a body. Deputy Scott Harrell responded, shut down the road, contacted detectives, and started a "crime scene log." Detectives posted information on their Facebook page in an attempt to identify the body, specifically, that the body was a black female with green and pink curlers in her hair. Ms. Price contacted SCPSO and informed detectives that she believed the body was her daughter. Dental records later confirmed that the body was that of Miss White, Ms. Price's minor daughter.
Dr. Marianna Eserman, the Deputy Coroner for Jefferson Parish, performed an autopsy on the victim and found that her body was in an advanced state of decomposition with extensive breakdown of her tissues. At trial, Dr. Eserman testified that the victim's body was so decomposed that they were unable to tell what specific injury caused her death, but concluded that the cause of death was homicidal violence of unknown means and the manner of death was homicide. She stated that strangulation or suffocation could not be ruled out. Elizabeth Hamilton, a DNA analyst at the Louisiana State Police Crime Lab, was accepted as an expert in the field of forensic DNA. Ms. Hamilton testified that she examined several items, including a sexual assault kit from the victim, a sheet from her bed, a pair of blue jeans found in defendant's car and oral swabs from defendant. Based on her analysis, there was a very high probability that the seminal fluid found in the victim's cervical, perineal, and anal areas belonged to defendant.
Detective Aaron Savoie testified that he obtained a search warrant for Ms. Price's residence, where defendant resided. He testified that when they arrived at Ms. Price's residence, the street was filled with people who were saying, "He did it, he killed the girl," and that those people were referring to defendant. Detective Dewhirst testified that those people were trying to get to defendant and kill him, and that when they arrived, the door of the residence had been kicked in.
On April 24, 2016, Jason Troxler, a SCPSO crime scene technician, took photographs and collected evidence at the St. Rose Avenue crime scene, where the victim's body was found, and at her residence. Mr. Troxler testified that he took photographs of the tire impressions located in the grassy area between St. Rose Avenue and the drainage ditch, and that he recovered a green bungee cord from near the ditch in close proximity to the *507 body. He noted that the black cap was missing from one of the hooks on that bungee cord. Mr. Troxler also identified photographs he took of defendant's wrists, which had marks on them. Dr. Eserman, the coroner, testified that the marks on defendant's wrists could be consistent with fingernail scratches.
At the victim's residence, Mr. Troxler took photographs of defendant's 2002 Cadillac and the residence. He found a bag of curlers or rollers inside a dresser and a package of bungee cords inside a kitchen drawer. Mr. Troxler identified a photograph of a black cap that was found inside defendant's trunk, the black cap itself, and a photograph of water bottles defendant kept in his vehicle. Mr. Troxler measured the tires on defendant's vehicle and identified photographs of his measurements.
Detective Joseph Dewhirst, the lead detective investigating this homicide, testified that he compared the tire marks on the road where the body was found to the tires on defendant's vehicle, and found the tires marks and defendant's tires were very similar. Detective Dewhirst also testified that he took a videotaped statement from defendant, which was played at trial. In the statement, defendant asserted that Miss White was having sex with three or four boys and that she "slipped back into doing some of the things she had been doing," specifically some "stupid" things, such as setting up boys to get beaten up. Defendant suggested that something possibly happened to her out of retaliation. Defendant also said during his statement, "What are you not getting from me?" and that he hoped that she "changed her mind," "tried to fight him off," and "went down swinging." Defendant further told Detective Dewhirst that he did not engage in sexual activity with the victim and that he did not know what happened to her. He said that he told Miss White goodbye before he left for work at approximately 2:00 to 2:30 A.M. on April 22, 2016.
According to Detective Dewhirst, defendant said the scratches on his wrists were made by people trying to get into the house. Detective Dewhirst testified that he found out from Ms. Price that she and defendant had recently purchased the bungee cords from a U-Haul store. Although the box of bungee cords was supposed to contain several different colors and sizes, the box found in the kitchen drawer was missing all of the green bungee cords. Detective Dewhirst stated that the bag of curlers retrieved by Mr. Troxler contained all green rollers and the pink ones were missing from the bag. He explained that the pink rollers were in the victim's hair and that one green roller was found at the crime scene on St. Rose Avenue.
Detective Dewhirst testified that they found a pair of blue jeans and a black rubber cap in defendant's trunk, and that they suspected the rubber cap was the missing cap for the green bungee cord that they found at the St. Rose crime scene. When he called Ms. Price, she told him that she had not had contact with defendant since the night they came to headquarters, and that she would not allow defendant to come back to the house. Detective Dewhirst maintained that once he obtained the DNA results, he knew defendant was lying when he said there had been no sexual contact between him and the victim.
Based on surveillance footage,[1] the police found that defendant's actions and *508 whereabouts on the night and following morning of Miss White's disappearance were as follows. Because defendant's vehicle had a very distinctive tail strip on the trunk which could be seen on the video, police were able to follow its route. Between 11:15 P.M. and 12:15 A.M., defendant's vehicle was pulled in with its "nose" to the house in the yard of his residence and defendant was backing the car out, turning it around, and then reversing it into the driveway by the side door. After defendant turned his vehicle around at 12:13 A.M., the lights then went out. At 12:25 A.M., the headlights came on, and defendant's vehicle traveled down Phoenix Street toward 27th Street. At 12:35 A.M., defendant's vehicle turned around and headed back toward the area where the victim's body was found.
At 12:57 A.M., defendant stopped at a Discount Zone to get gas and air; and while there, opened his trunk, manipulated something white, and readjusted things. The detective noticed from the video that defendant's vehicle did not turn very well due to the extra wide tires. At 1:05 A.M., defendant's vehicle returned home, pulling in straight. Defendant left again at 2:30 A.M. for work.
Detective Dewhirst further testified that he showed Ms. Price a video of the neighborhood children walking to the bus stop on the morning of April 22, 2016, and that Ms. Price stated Miss White was not in that video. This was confirmed by Ms. Price during her testimony.
Several fact witnesses testified at trial: Ms. Price, Tara Collins, Debbie Bordelon, Nicole Celestine, Patricia Carter, and Katrice Reid.
Ms. Price, the victim's mother, testified to the following at trial. Defendant, who she continually referred to as "the monster," had been her boyfriend for nine years and had been living with her since January of 2007. Ms. Price last saw her daughter on the night of Thursday, April 21, 2016, before she left for work. After her night shift, Ms. Price returned home between 8:00 and 8:30 A.M. on April 22, 2016. When she entered the house, she noticed that there was a lot of dirt and mud on the floor by the side door, which she thought was "weird." Ms. Price realized her daughter was missing when "Travina" called her at approximately 6:45 P.M., and asked if Miss White was with Ms. Price. Ms. Price answered, "no," and said she thought her daughter was with her.
After Ms. Price realized her daughter was missing, she told defendant, who got up quickly and suggested they go to the police station. Ms. Price thought it was odd that defendant did not first suggest they call some friends, as Miss White had never run away and was not the type to run away. After going to the police, Ms. Price put up fliers, put a post on Facebook, and sent text messages to family and friends in an effort to find Miss White. She also looked for things that were out of place in the house. During her search, she noticed that Miss White's school uniform was missing. Ms. Price later found one of Miss White's Bonnabel High School uniform shirts in a tote full of defendant's clothing. She explained that it looked out of place *509 like it had been shoved down between defendant's clothes. Ms. Price also found Miss White's key in defendant's watch box, which had been in Ms. Price's top drawer. Defendant was the only person other than Ms. Price who knew where the key was. Ms. Price also discovered that some large white towels were missing from her bathroom. Finally, Ms. Price testified that although Miss White was found with pink curlers in her hair, she normally would never have left the house voluntarily with curlers in her hair.
One of Ms. Price's cousins, Tara Collins, testified at trial. She testified that she knew Miss White all of her life. When she found out Miss White was missing, Ms. Collins went to Ms. Price's house to try and help. While she was there, defendant called her aside, which she thought was unusual as she did not know him well. During their conversation, defendant told her that they were not going to find Miss White. Ms. Collins wanted to walk around to see if there were any cameras, but defendant did not want to do that. She recalled that every time she saw Miss White, her hair was beautiful and that she always took care of herself. Ms. Collins described Miss White as very quiet and very shy like her mother.
Two neighbors on Ms. Price's street, Debbie Bordelon and Patricia Carter, also testified. Ms. Bordelon stated that she knew Miss White from seeing her walk back and forth to school, and that she did not see Miss White go to school or come home on April 22, 2016. Ms. Bordelon also testified that while she did not know defendant, when he came to her house looking for Miss White, she recalled that defendant seemed nervous. Ms. Bordelon testified that on the night in question, she went outside at 2:00 A.M. and noticed defendant was cleaning his trunk with a white cloth, which he threw in the garbage can when he was finished and went inside. Ms. Carter testified that at approximately 2:20 or 2:30 A.M. on April 22, 2018, she heard the slamming of doors or car trunk. She also recalled that Ms. Bordelon came to her door and told her that between 2:00 and 2:30 a.m., her neighbor was wiping something out of the trunk and that "he" threw "it" in the garbage can. Ms. Carter noted that there was mud on defendant's Cadillac.
Miss White's best friend, Nicole Celestine, testified that they rode the bus and went to school together, but that Miss White was not on the bus the day she went missing. Ms. Celestine also testified that Miss White was very careful with her appearance, would never leave the house with rollers in her hair, and would never run away from home.
A neighbor and good friend of Ms. Price's, Katrice Reid, testified that she went to Ms. Price residence when she found out Miss White was missing. Ms. Reid noted that defendant was "nonchalant" and made it seem that it was not a "big deal" that Miss White was missing. She recalled that defendant let her know that there was a possibility that Miss White would never be found and that Miss White was "well hidden" by now. She also recalled that when they were in the front room with other individuals around, defendant grabbed her by the arm, took her to the bedroom and asked, "If this goes bad, will you be there to take care of her?" Ms. Reid responded that of course she would, as Ms. Price was her best friend. Ms. Reid stated that a "red flag" went up when he asked her that. She asserted that defendant seemed like he was trying to deflect people from looking for Miss White, and that he made sure to point out that she was conversing with more than one boy.
Ms. Reid further testified that defendant said three different times that they would *510 not find Miss White. She asked him why he kept saying that, and defendant replied, "because she bit off more than she could chew." When she asked what that meant, he said, "Whatever happened to her happened because she thought she was big and bad." Ms. Reid thought that defendant was confessing to her. Ms. Reid testified that later on, she saw the door being kicked in and that defendant was not trying to block it. She did not see defendant's wrists get injured trying to stop the crowd from coming in.
LAW AND ANALYSIS
In counseled assignments of error one through three, defendant argues that the evidence is insufficient to support his convictions, the district court erred in denying his motion for post-verdict judgment of acquittal, and the district court erred in denying his motion for new trial. In his pro se brief, defendant contends that missing transcripts from two previous cases of court proceedings which contained witness testimony, court rulings, orders, objections by his counsel, and a court proceeding which he did not attend, make it impossible for this Court to properly review any and all assignments of error that "will be made by Appellant."[2]
Assignments of Error One Through Three[3]
Defendant argues that the evidence was insufficient to prove who killed the victim or that the killing was an intentional act as no cause of death was proven at trial. He asserts that any number of people could have had bungee cords like the ones found at the crime scene, that the presence of hair curlers established nothing in terms of proving that he was the perpetrator. He also maintains that the police did not definitively match the tire marks found on the crime scene to defendant's vehicle.
Defendant asserts that it is difficult to believe that if he killed the victim at her home, put her body in the car, and dumped it on St. Rose Street, that he did so without leaving any trace of her blood anywhere or any evidence of what the murder weapon might have been. He also contends that even though the evidence suggested he had sexual contact with the victim before her death, it did not prove that if he did kill her, he did so deliberately. With respect to the obstruction of justice charge, defendant argues that there was no DNA that was connected to the victim found in his vehicle. For the foregoing reasons, defendant argues that because the evidence was insufficient to support the convictions, the trial court erred by denying the motions for post-verdict judgment of acquittal and for a new trial.
The State responds that the evidence was sufficient to support the convictions and that no testimony or other evidence supported the guilt of anyone other than defendant. It further responds that there was absolutely no reasonable hypothesis of innocence based on defendant's odd behavior, unrefuted statements, DNA results, tire tracks, and the video surveillance footage of his car being driven down St. Rose Avenue on the night of the murder. Therefore, the State argues that the trial judge acted reasonably in finding that there was no valid explanation for defendant's actions and statements that would support his innocence. The State also asserts that all of the evidence points to the killing being *511 intentional, and that no evidence supported a conclusion that the killing was accidental or unintentional.
The constitutional standard for testing the sufficiency of the evidence is whether after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). Under the Jackson standard, a review of a criminal conviction record for sufficiency of the evidence does not require the court to ask whether it believes that the evidence at the trial established guilt beyond a reasonable doubt. Instead, the reviewing court is required to consider the whole record and determine whether any rational trier of fact could have found guilt beyond a reasonable doubt. State v. Jones, 08-20 (La. App. 5 Cir. 4/15/08), 985 So.2d 234, 240.
La R.S. 14:30.1 defines second degree murder, in pertinent part, as the killing of a human being when the offender has specific intent to kill or to inflict great bodily harm. Specific criminal intent is that state of mind which exists when the circumstances indicate that the offender actively desired the prescribed criminal consequences to follow his act or failure to act. Specific criminal intent, as a state of mind, need not be proven as fact but may be inferred from the circumstances and the actions of the accused. State v. Martinez, 09-740 (La. App. 5 Cir. 3/23/10), 38 So.3d 926, 932.
Defendant was also convicted of obstruction of justice. La. R.S. 14:130.1 provides that the crime of obstruction of justice, when committed with the knowledge that such act may affect a criminal proceeding, includes "[t]ampering with evidence with the specific intent of distorting the results of any criminal investigation or proceeding which may reasonably prove relevant to a criminal investigation or proceeding." This provision further states that "[t]ampering with evidence shall include the intentional alteration, movement, removal, or addition of any object or substance" at the location of any incident which the perpetrator knows or has good reason to believe will be the subject of any law enforcement investigation.
Although the evidence was primarily circumstantial, based on the following, we find the evidence was sufficient under the Jackson standard to support the convictions of second degree murder and obstruction of justice. The evidence showed that the victim was last seen by defendant at home on April 22, 2016, at approximately 2:45 A.M. Dr. Eserman testified that the cause of death was homicidal violence of unknown means and that the manner of death was homicide. The DNA results indicated that defendant had engaged in sexual activity with the victim, although defendant denied that he did so. There was evidence that defendant had marks on his wrists, and Dr. Eserman testified that these marks could be consistent with fingernail scratches.
In addition, the State presented evidence that tire marks went off the road where the body was found and then back onto the road, that the tire marks were wide and not made by a typical vehicle, that defendant had wide tires on his vehicle, and that the measurements of defendant's tires were very similar to the tire impressions at the St. Rose crime scene. Mr. Troxler, the crime scene technician, recovered a green bungee cord with a missing black cap, which he located near the ditch in close proximity to the body. Mr. Troxler located a black cap inside of defendant's trunk which Detective Dewhirst suspected was the missing cap for the bungee cord found at the St. Rose *512 crime scene. In addition, the box of bungee cords found in the kitchen drawer of defendant's residence was supposed to contain several different colors, including green, but that the box was missing all of the green bungee cords.
Furthermore, Detective Dewhirst testified regarding the surveillance footage from several locations around Kenner and St. Rose on April 22, 2016. This surveillance showed defendant's vehicle turning around at 12:13 A.M. and parking by the side door of his residence. Approximately twelve minutes later, defendant's vehicle traveled a route towards the crime scene on St. Rose Avenue, specifically, down Phoenix Street, took a left onto 27th Street, took a right onto Bessemer Street, passed in front of Hollywood Laundry, crossed over Veterans Boulevard, took the Loyola Drive exit to I-310, passed in front of 720 St. Rose Avenue, turned around, came back to where the "dump site" was, and returned to his home from those same locations. The video also showed defendant stopping at the Discount Zone, opening the trunk, and manipulating something white. On April 29, 2016, Detective Dewhirst conducted a test run using defendant's vehicle, noting that the still photographs of the surveillance footage on April 22 and April 29 showed that they were the same vehicle.
Ms. Price testified that she last saw the victim alive on the night of April 21, 2016, before she went to work. When she got home from work on April 22, 2016, between 8:00 and 8:30 a.m., she noticed that there was a lot of dirt and mud on the floor by the side door. The victim was not at home then, which was routine since she would have gone to school by then. Ms. Price later found the victim's missing school uniform hidden in defendant's tote bag, and the victim's house key hidden in defendant's watch box. Ms. Price noticed that some large white towels were missing from her bathroom.
Several witnesses testified regarding defendant's odd behavior. Ms. Collins testified that defendant took her aside and told her they were not going to find the victim. Ms. Bordelon testified that she went outside at 2:00 A.M. on April 22, 2016, and saw defendant cleaning his trunk with a white cloth, after which he threw the cloth into the garbage can and went inside. Ms. Carter asserted that at approximately 2:20 or 2:30 A.M. on April 22, 2016, she heard the slamming of doors or car trunks. She recalled Ms. Bordelon coming to her door and telling her that defendant was wiping the trunk of his vehicle, after which he threw the cloth into the garbage can. Ms. Reid testified that defendant was "nonchalant" about finding the victim and told her that there was a possibility that she would never be found, and that she was "well hidden" by now. She thought it odd when defendant took her to the bedroom and asked if she would be there for Ms. Price "if this goes bad." Ms. Reid also recalled that defendant kept saying they would not find the victim "because she bit off more than she could chew" and "whatever happened to her happened because she thought she was big and bad," which Ms. Reid interpreted as a confession. Further, Ms. Reid did not see defendant's wrists get injured when people were trying to get into the house. This testimony, along with Dr. Eserman's, undermines defendant's claim that the scratches on his wrists were inflicted by the people trying to get into his house, and not by the victim.
Viewing the evidence in a light most favorable to the State, we find that a rational trier of fact could have concluded that defendant committed the second degree murder of the victim, and that every reasonable hypothesis of innocence was excluded. The evidence showed that defendant *513 had the specific intent to kill the victim or to inflict great bodily harm upon her and that he tampered with the evidence with the specific intent of distorting the results of a criminal investigation. Accordingly, we also find that a rational trier of fact could have concluded that defendant committed the crime of obstruction of justice. Considering the foregoing, we further find that the trial court did not err by denying the motion for new trial and the motion for post-verdict judgment of acquittal.[4] These assignments of error lack merit.
Defendant's Pro Se Brief
In his pro se brief, defendant contends that his United States Fourteenth Amendment due process rights, his Sixth Amendment effective assistance of counsel rights, and his right to judicial review of a felony conviction under Louisiana Constitution, Article 1, Section 19, have been denied because the Twenty-Ninth Judicial District Court has not provided to him all of the transcripts of court proceedings for case numbers 16-0263 and 16-0468.[5] Defendant claims that several transcripts have been purposefully omitted from the appellate record by the Twenty-Ninth Judicial District Court. Defendant asserts the lack of these transcripts makes it impossible for this Court to properly review any and all assignments of error that he will make and for this Court to review any errors patent that may exist. Defendant argues that his appellate counsel, who was not his trial counsel, could not and did not have the opportunity to perform his/her mandated duty to represent him because of the missing transcripts. Based on the foregoing, defendant argues that this Court should reverse his convictions, vacate his sentences, and remand the matter for a new trial.
La. C.Cr.P. art. 914.1 states as follows:
A. The party making the motion for appeal shall, at the time the motion is made, request the transcript of that portion of the proceedings necessary, in light of the assignment of errors to be urged. Not later than five days after the motion, the opposing party may designate in writing the transcript of that portion or portions of the proceedings necessary to oppose the appeal.
B. A transcript of any portion of the proceedings which does not relate to anticipated assignment of errors shall not be furnished to a party for purposes of appeal and shall not result in delay of preparation of the appeal record.
C. (1) An attorney who requests a transcript in accordance with this Article must certify there are good grounds for such request in light of the assignment of errors to be urged.
* * *
D. The trial court or the appellate court may designate additional portions of the transcript of the proceedings which it feels are necessary for full and fair review of the assignment of errors.
*514 The party making the motion for appeal bears the burden of furnishing the appellate court with a record of the trial proceedings needed for review; and therefore, any inadequacy of the record is imputable to the appellant. State v. Ronquille, 09-81 (La. App. 5 Cir. 5/26/09), 16 So.3d 411, 416, writ denied, 09-1397 (La. 2/5/10), 27 So.3d 298 ; State v. Shaw, 00-1051 (La. App. 5 Cir. 2/14/01), 785 So.2d 34, 42, writ denied, 01-0969 (La. 2/8/02), 807 So.2d 861. An appellate court renders its judgment based upon the record filed on appeal; thus, if transcripts, exhibits, or other documentation are missing and the appellant fails to act, there is no basis for the appellate court to determine that the trial court erred. Id.
Neither defendant nor the State have requested or designated any additional transcripts in compliance with La. C.Cr.P. art. 914.1A. Moreover, the record does not indicate that defendant requested any transcript at the conclusion of any hearings which he claims are missing, or that the hearings from which he claims the transcripts were purposefully omitted were ever transcribed for any reason. Although the record contains minimal hearing transcripts from district court case nos. 16-0263 and 16-0468, there is nothing to show defense counsel or the State requested that other hearings from these case proceedings be transcribed and filed into these records.
In State v. Sharp, 35,714 (La. App. 2 Cir. 2/27/02), 810 So.2d 1179, 1194, writ denied, 02-1736 (La. 6/6/03), 845 So.2d 1081, defendant claimed that the record was incomplete because the voir dire transcript and the reading of the indictment were not furnished. Defendant claimed he could not prepare his assignments of error without the transcript and requested that the appellate court order a complete copy of the transcript including the voir dire. The appellate court declined, noting that the defendant is not entitled to supplement the record on appeal unless he showed that the requested record was related to specific assigned errors. The appellate court found that neither the defendant nor his attorney assigned as error any issues involving the jury voir dire. The appellate court noted that the defendant's generic allegations and his assertion that he needed the transcript to prepare his assignments of error amounted to a "fishing expedition" and was insufficient to require a supplementation of the record. State v. Sharp, 810 So.2d at 1194.
Defendant has not indicated why the requested transcripts are relevant or set forth what errors the trial court allegedly made during those proceedings or hearings. Neither defendant nor his attorney has alleged that these transcripts are relevant to any assignments of error, as required by La. C.Cr.P. art. 914.1. As in Sharp, defendant's generic assertions that the lack of these transcripts makes a proper review of his appeal and "any and all assignment of error claims that will be made by Appellant" impossible amounts to a "fishing expedition," and such a generic claim is insufficient to support supplementation of the record.
Considering the foregoing, we find this assignment of error lacks merit.
ERRORS PATENT REVIEW
We have also reviewed the record for errors patent in accordance with La. C.Cr.P. art. 920 ; State v. Oliveaux, 312 So.2d 337 (La. 1975) ; and State v. Weiland, 556 So.2d 175 (La. App. 5 Cir. 1990).
Based on the record, defendant was not advised of the time period for seeking post-conviction relief, as required by La. C.Cr.P. art. 930.8. Accordingly, we hereby advise defendant that he has two years from the date his convictions and sentences *515 become final to file for post-conviction relief under the provisions of La. C.Cr.P. arts. 914 or 922, or to seek an out-of-time appeal. See State v. Brooks, 12-226 (La. App. 5 Cir. 10/30/12), 103 So.3d 608, 615, writ denied, 12-2478 (La. 4/19/13), 111 So.3d 1030.
CONCLUSION
For the reasons set forth herein, we affirm defendant's convictions and sentences.
CONVICTIONS AND SENTENCES AFFIRMED

Detective Dewhirst testified that they obtained surveillance footage from several locations around Kenner and St. Rose. Based on the surveillance videos, the police determined a route that defendant's vehicle traveled on the morning of April 22, 2016. The surveillance suggested that defendant drove down Phoenix Street, took a left onto 27th Street, took a right onto Bessemer Street, passed in front of Hollywood Laundry, crossed over Veterans, took the Loyola Drive exit to I-310, made his way down I-310, passed in front of 720 St. Rose Avenue, turned around, came back to where the "dump site" was, and returned to his home from the same locations. Detective Dewhirst noted that the time stamps were not all correct as to the actual time and that they determined how far off each camera was.

The records to which defendant refers are from district court case numbers 16-468 and 16-283, which are pre-trial proceedings and are joint exhibits to the appellate record.

Assignments of error one through three are addressed together because they are related, and defendant discusses them together in his appellate brief.

The decision on a motion for a new trial rests within the sound discretion of the trial judge, and his ruling will not be disturbed on appeal absent a clear showing of an abuse of discretion. State v. Mouton, 16-673 (La. App. 5 Cir. 4/26/17), 219 So.3d 1244, 1254, writ denied, 17-1149 (La. 5/18/18), 242 So.3d 572. The question of sufficiency of the evidence is properly raised in the trial court by a motion for post-verdict judgment of acquittal under La. C.Cr.P. art. 821. Mouton, Id. ; State v. Bazley, 09-358 (La. App. 5 Cir. 1/11/11), 60 So.3d 7, 18, writ denied, 11-282 (La. 6/17/11), 63 So.3d 1039.

These are the district court case numbers for pre-trial proceedings related to this matter. The second degree murder charge and the obstruction of justice charge initially had separate case numbers.