796 So.2d 101 (2001)
STATE of Louisiana, Appellee,
v.
Jason RATLIFF, Appellant.
No. 35,144-KA.
Court of Appeal of Louisiana, Second Circuit.
September 26, 2001.
*102 Indigent Defender Board by William Rick Warren, Minden, Louisiana Appellate *103 Project by Peggy J. Sullivan, Monroe, Counsel for Appellant.
Richard Ieyoub, Attorney General, James M. Bullers, District Attorney, J. Schuyler Marvin, C. Sherburne Sentell, III, Assistant District Attorneys, Counsel for Appellee.
Before STEWART, CARAWAY and DREW, JJ.
STEWART, J.
The defendant, Jason Ratliff, was tried by jury and convicted of conspiracy to possess a Schedule IV controlled dangerous substance, diazepam (Valium), with the intent to distribute. He was sentenced to serve two years imprisonment at hard labor and to pay a fine of $7,500 and court costs. An additional $2,500 was assessed as costs of prosecution to be paid to the district attorney's office in Webster Parish. The defendant now appeals his conviction and sentence. We affirm.

FACTS
In October 1999, Roberto Hernandez was a passenger in a customized van driven by his fiancee, Claudia Ortega.[1] Ortega was driving the van eastbound on Interstate 20 through Webster Parish, Louisiana, when they were stopped by Louisiana State Trooper Ted Raley for improper lane usage. Hernandez and Ortega seemed nervous and gave Trooper Raley inconsistent information regarding their destination. After obtaining consent to search the vehicle, Trooper Raley found a Zip Lock bag filled with a large number of small blue pills which appeared to be diazepam, otherwise known as Valium. Hernandez and Ortega were arrested and taken to the Webster Parish Sheriff's Office. A further search revealed seven Zip Lock bags filled with a total of 63,000 to 64,000 small blue tablets.
Troopers Lloyd Porter, Rick Horton, and J.D. Page of the narcotics section of the Louisiana State Police took over the investigation. After an interview with Trooper Porter, Hernandez agreed to cooperate with the troopers and to deliver the drugs to the defendant as originally planned. Hernandez related that the defendant previously introduced him to a man called "Chu Cho" in Laredo, Mexico, which is right across the border from Laredo, Texas. Hernandez stated that he had an agreement with the defendant to receive the diazepam from Chu Cho and to transport it from Laredo, Texas, to the defendant in Indianapolis, Indiana. Hernandez was to be paid $4,500 in cash for making the delivery. The defendant was to pay Chu Cho directly for the drugs.
After Hernandez's arrest in Minden, Trooper Horton, and Special Agent Kirk Walker of the U.S. Customs Service initiated a cell phone call from Hernandez to the defendant. The phone call was recorded. The defendant initiated a second cell phone call to Hernandez while Hernandez was still in custody in Minden. The troopers attempted to record this second conversation, but were unsuccessful. During one of these two phone calls, the defendant asked Hernandez if he wanted a car instead of money as payment. Hernandez told the defendant that he needed the money.
After contacting the Indiana State Police and coordinating a controlled delivery of the diazepam to the defendant, Troopers Porter, Horton, Page, and Agent Walker, together with Hernandez and Ortega, traveled in various separate vehicles to Indiana. Trooper Horton drove Hernandez and Ortega in Hernandez's van and *104 had possession of the black duffel bag containing the diazepam. During the drive, the defendant contacted Hernandez by cell phone a third time to check to see if Hernandez was still en route and if everything was still fine. Agent Walker overheard Hernandez's side of the conversation during all three cell phone calls between Hernandez and the defendant and listened to the recorded conversations at trial. No mention was made during these conversations of what was to be exchanged or sold between Hernandez and the defendant.
Upon arrival in Indianapolis, Indiana, state troopers from Indiana and Louisiana divided into different arrest teams and waited in various spots near the delivery locationthe parking lots of a Denny's restaurant and an adjacent Motel 6. The controlled delivery from Hernandez to the defendant was captured on surveillance videotape by the Indiana State Police from a surveillance van. Hernandez wore a transmitting device which recorded the audio portion of the surveillance videotape.
As shown in the videotape, Hernandez and the defendant went inside the Denny's restaurant together. They then left Denny's and walked toward the defendant's truck located in Denny's parking lot. The defendant asked Hernandez whether he had "it" in a suitcase or gym bag. The defendant drove Hernandez to his van, which was located in the Motel 6 parking lot. Hernandez got out of the defendant's truck, opened the van door, and took the closed duffel bag containing the diazepam out of his van. Hernandez then got back into the defendant's truck and placed the duffel bag in the defendant's truck between the front seats. The defendant moved the bag to the back seat. Hernandez then asked the defendant where his money was located. As the defendant backed his truck out of the parking lot, he and Hernandez saw a police car with flashing lights. The defendant attempted to flee the scene by driving his truck out of the motel parking lot, almost hitting Agent Walker's vehicle.
When the defendant was arrested, the black duffel bag containing the diazepam was found in his truck. The drugs remained in the possession of the Indiana State Police after the defendant's arrest. Cash in the amount of $30,100.02 was seized from the defendant at the time of his arrest. The cash was found in a suitcase located in the rear of the defendant's truck.
On the afternoon of the defendant's arrest, Officer Richard Reed of the Indiana State Police performed a consent search of the defendant's residence. Officer Reed found over a thousand small blue pills in the defendant's garage hidden in an oil filter box.
At trial, Bradley M. Morrin, a drug chemist with the Indianapolis Laboratory and an expert in narcotics identification, testified that he tested approximately 70 of the pills provided to him by the Indiana State Police as random samples. Morrin determined that the pills were diazepam, commonly known by the trade name "Valium." His report was introduced into evidence at trial.
Richard Childress of the Shreveport Police Department, who was assigned to the DEA Task Force, testified at trial as an expert in the determination of the street value of controlled dangerous substances. He testified that the street value for a single Valium pill in Northwest Louisiana was five dollars at the time of the offense. Thus, the approximately 64,000 pills seized from the defendant had a total street value of about $320,000.
Trooper Driskell identified the defendant at trial as the person who received the controlled delivery of the drugs in the *105 instant offense. The surveillance videotape was played for the jury and introduced into evidence.
In accordance with an agreement to testify truthfully, Hernandez testified at trial regarding the defendant's participation in the plan to receive the diazepam and related the details of the controlled delivery. For his part in the crime, Hernandez was sentenced to 10 years imprisonment at hard labor, which was suspended or probated. Hernandez served 45 days in the Webster Parish Jail. His van, which he valued at approximately $10,000 or $12,000, was seized by the police. Charges were never filed against Ortega.
The defendant testified on his own behalf at trial. He also presented several witnesses, namely his wife, brother, and father. Sandra Ratliff and Jack Ratliff, the defendant's wife and brother, testified that the defendant was a nurse, operated a power washing business, and occasionally bought and sold automobiles. They testified that the defendant was planning to expand his power washing business and had borrowed some money from his father for that purpose.
The defendant's father, Jack Lyn Ratliff, Sr., testified at trial regarding money he lent the defendant. Ratliff stated that he derived income as a landlord and that he dealt in cash which he kept in a safe. He paid bills with money orders. Ratliff asserted that the Saturday before the defendant's arrest, he lent the defendant $23,000 in cash to expand his power washing business. He further testified that he was in the process of trying to prove that the cash seized from the defendant was his.
The defendant testified regarding his education and careers in nursing and the power washing business. He identified documentation and photographs of power washing equipment which he claimed he intended to purchase with cash seized from his truck. He also identified a proposal he prepared outlining his planned expenditures for expansion of his power washing business, which he claimed to have presented to his father when asking to borrow money in the amount of $23,000. The defendant also testified that just prior to his arrest, he sold a 1993 Ford Probe for a friend living in Moscow. He had $7,000 in cash from the sale of the vehicle. The defendant stated that he was to keep any profit from the sale over $5,000, with the $5,000 going to his friend in Moscow. Thus, the defendant explained that, of the cash seized at his arrest, $23,000 represented a business loan from his father, $5,000 belonged to his friend in Moscow, and only $2,000 was his own to spend.
The defendant also testified that he knew Hernandez through body-building contests and that he had sold several automobiles to Hernandez in the past. He identified pictures and vehicle history reports printed from the internet regarding some vehicles he claimed he sold. The defendant stated that just prior to his arrest, he sold a boat and a Suburban vehicle to Hernandez. The defendant stated that his younger brother delivered the boat and vehicle to Hernandez in Dallas, Texas, for a delivery fee of $250. He asserted that Hernandez traveled to Indiana to settle this debt with his brother and to bring some jewelry for the defendant to possibly purchase. The defendant explained that he thought the jewelry was in the duffel bag and that he did not know anything about the diazepam. He denied ever touching the duffel bag. He explained that he fled when the police arrived because he saw guns and feared for his life. He further explained that the cell phone calls made prior to meeting with Hernandez were regarding the money owed by Hernandez to his brother and the jewelry *106 he was considering purchasing. The defendant admitted that the money seized at his arrest was divided into four stacks of $5,000 each and one stack of $10,000. The defendant emphatically denied taking drugs of any kind and denied any knowledge of the small blue pills found in his garage after his arrest. He suggested that these pills could have been planted by the police. Finally, the defendant acknowledged that he was charged with forgery in Indiana in 1992 and pled guilty to misdemeanor theft.
The jury found the defendant guilty as charged. He was subsequently sentenced to serve two years imprisonment at hard labor and to pay a fine of $7,500 and court costs. An additional $2,500 was assessed as costs of prosecution and ordered to be paid to the district attorney's office. A timely filed motion to reconsider sentence was denied. This appeal followed.

DISCUSSION

Sufficiency of the Evidence
In his first assignment of error, the defendant asserts that the evidence was insufficient to support his conviction. He argues that he was "set up" by Hernandez whose testimony was not credible. He further argues that the state proved only that Hernandez was transporting drugs and that the two knew each other. The evidence, according to the defendant, did not prove beyond a reasonable doubt that he made an agreement with Hernandez for the specific purpose of committing a crime.
Although a claim of insufficient evidence is better addressed by a motion for postverdict judgment of acquittal filed in the trial court pursuant to La.C.Cr.P. art. 821, this court has held that it may also be raised by assignment of error on appeal. State v. McKinney, 31,611 (La.App.2d Cir.2/24/99), 728 So.2d 1009. The standard of appellate review for a sufficiency of the evidence claim is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979).
This court's authority to review questions of fact in a criminal case is limited to the sufficiency of the evidence evaluation under Jackson and does not extend to credibility determinations made by the trier of fact. La. Const. art. 5, § 10(B); State v. Williams, 448 So.2d 753 (La.App. 2d Cir.1984). A reviewing court accords great deference to a jury's decision to accept or reject the testimony of a witness in whole or in part. State v. Bosley, 29,253 (La.App.2d Cir.4/2/97), 691 So.2d 347, writ denied, 97-1203 (La.10/17/97), 701 So.2d 1333.
In the absence of internal contradiction or irreconcilable conflict with physical evidence, one witness's testimony, if believed by the trier of fact, is sufficient support for a requisite factual conclusion. State v. White, 28,095 (La.App.2d Cir.5/8/96), 674 So.2d 1018, writ denied, 96-1459 (La.11/15/96), 628 So.2d 760 and 98-0282 (La.6/26/98), 719 So.2d 1048.
The determination of whether requisite intent is present in a criminal case is for the trier of fact. State v. Huizar, 414 So.2d 741 (La.1982); State v. Butler, 322 So.2d 189 (La.1975); State v. Maxie, 30,877 (La.App.2d Cir.8/19/98), 719 So.2d 104. Evidence of flight, concealment, and attempt to avoid apprehension indicate consciousness of guilt. State v. Davies, 350 So.2d 586 (La.1977); State v. Thompson, 33,204 (La.App.2d Cir.3/1/00), 754 So.2d 412; State v. Daniels, 614 So.2d 97 (La.App. 2d Cir.1993), writ denied, 619 So.2d 573 (La.1993).
*107 The defendant was charged with violation of La. R.S. 40:979, which is a specific provision for conspiracy to commit a violation of the Controlled Dangerous Substances Law (in this case, La. R.S. 40:969(A)). La. R.S.40:969(A) provides in pertinent part that it shall be unlawful for any person knowingly or intentionally:
(1) To produce, manufacture, distribute, or dispense or possess with intent to produce, manufacture, distribute, or dispense a controlled dangerous substance classified in Schedule IV;
Diazepam is a Schedule IV controlled dangerous substance. See La. R.S. 40:964.
La. R.S. 14:26(A) defines criminal conspiracy as follows:
Criminal conspiracy is the agreement or combination of two or more persons for the specific purpose of committing any crime, provided that an agreement or combination to commit a crime shall not amount to a criminal conspiracy unless, in addition to such agreement or combination, one or more of such parties does an act in furtherance of the object of the agreement or combination.
Intent to distribute illegal drugs may be established by proving circumstances surrounding the defendant's possession which give rise to reasonable inferences of intent to distribute. State v. Ramoin, 410 So.2d 1010 (La.1981); State v. Elzie, 343 So.2d 712 (La.1977). The intent to distribute can be established based solely on the amount found only if the quantity of the drug is so large that no other inference is possible. State v. Hearold, 603 So.2d 731 (La.1992); State v. House, 325 So.2d 222 (La.1975); State v. Ard, 95-1567 (La.App. 4th Cir.12/27/96), 686 So.2d 1026, writ denied, 98-2285 (La.2/5/99), 737 So.2d 740. The presence of large sums of cash also is considered circumstantial evidence of intent to distribute. State v. Young, 99-1264 (La. App. 1st Cir.3/31/00), 764 So.2d 998; State v. Jordan, 489 So.2d 994 (La.App. 1st Cir. 1986).
The defendant makes a heroic effort to deny his participation in the instant crime and attempts to explain away virtually every incriminating fact and circumstance presented at trial. However, viewed in the light most favorable to the prosecution, there was sufficient evidence presented at trial to support the defendant's conviction of conspiracy to possess with intent to distribute a Schedule IV controlled dangerous substance, diazepam.
Specifically, the testimony of the state's witness, Hernandez, was direct evidence of the defendant's agreement to accept delivery of a large quantity of diazepam tablets for the specific purpose of possession of diazepam with the intent to distribute. In addition to such agreement, testimony by Hernandez and several officers proved that both the defendant and Hernandez did acts in furtherance of the object of the agreement. Those acts included the fact that Hernandez traveled to Indiana for the specific purpose of delivering the diazepam to the defendant, the phone calls that were made by both Hernandez and the defendant regarding progress during the trip and Hernandez's preferred payment, the meeting between Hernandez and the defendant in Indiana, the delivery of the diazepam by Hernandez, and the defendant's acceptance of the diazepam. Although the defendant argues that Hernandez's testimony is not credible, the defendant fails to show any internal contradiction or irreconcilable conflict between Hernandez's testimony and the physical evidence. Thus, this one witness's testimony, which was obviously believed by the trier of fact, is sufficient support for a requisite factual conclusion. State v. White, supra.
*108 Also, the actual transfer of the diazepam from Hernandez to the defendant's possession was captured on police surveillance videotape and witnessed by several officers, who testified at trial. The expert testimony presented by the state proved that the pills seized after the controlled delivery were in fact diazepam. Expert testimony also established the large quantity of diazepam possessed by the defendant and the estimated street value of the quantity possessed.
Additionally, the defendant's intent to distribute illegal drugs was also established based solely on the quantity of the diazepam (63,000 to 64,000 tablets), because the amount was so large that no other inference is possible. State v. Hearold, supra; State v. House, supra; State v. Ard, supra. In fact, possession of the diazepam for personal use was ruled out by the defendant's own testimony that he did not use drugs.
Although the defendant's possession of the large sum of cash at the time of his arrest could also be considered circumstantial evidence of intent to distribute, the other evidence at trial sufficiently supported the finding of intent without reliance on this factor, the circumstances of which were elaborately explained by the defendant and his witnesses. State v. Young, supra; State v. Jordan, supra.
Thus, we find that viewed in the light most favorable to the prosecution, the evidence presented at trial was sufficient to support the defendant's conviction. This assignment of error is without merit.

Sentencing
In his second assignment of error, the defendant contends that the sentence imposed was cruel and excessive considering the facts of the case and his personal background.
Since the defendant's motion for reconsideration of sentence merely alleged that the sentence is excessive, under State v. Mims, 619 So.2d 1059 (La.1993), he is "simply relegated to having the appellate court consider the bare claim of excessiveness." This bare claim preserves only a claim of constitutional excessiveness. Mims, supra; State v. McEachern, 624 So.2d 43 (La.App. 2d Cir.1993).
Whether the sentence imposed is too severe depends on the circumstances of the case and the background of the defendant. A sentence violates La. Const. art. 1, § 20, if it is grossly out of proportion to the seriousness of the offense or nothing more than a purposeless and needless infliction of pain and suffering. State v. Dorthey, 623 So.2d 1276 (La.1993); State v. Bonanno, 384 So.2d 355 (La.1980). A sentence is considered grossly disproportionate if, when the crime and punishment are viewed in light of the harm done to society, it shocks the sense of justice. State v. Hogan, 480 So.2d 288 (La.1985); State v. Bradford, 29,519 (La.App.2d Cir.4/2/97), 691 So.2d 864.
La. R.S.40:979(A) provides the penalty applicable in the instant case:
Except as otherwise provided herein, any person who attempts or conspires to commit any offense denounced and/ or made unlawful by the provisions of this Part shall, upon conviction, be fined or imprisoned in the same manner as for the offense planned or attempted, but such fine or imprisonment shall not exceed one-half of the punishment prescribed for the offense, the commission of which was the object of the attempt or conspiracy.
La. R.S. 40:969(B) provides a sentence of "imprisonment at hard labor for not more than ten years" and a "fine of not more than fifteen thousand dollars."
*109 Under La.C.Cr.P. art. 887(A), a defendant who is convicted of an offense shall be liable for all costs of the prosecution or proceeding, whether or not costs are assessed by the court. Such costs are recoverable by the party or parties who incurred the expense.
Although not at issue, our review of the record reveals that the trial court adequately considered both aggravating and mitigating factors in sentencing the defendant. Even though the defendant's fine of $7,500 was the maximum possible fine for his conviction, the defendant's sentence of two years imprisonment at hard labor was less than half of the maximum possible sentence of five years at hard labor. The additional costs were supported by the documentation supplied in the defendant's pre-sentence investigation report. The defendant's sentence does not appear grossly out of proportion with the seriousness of the offense in light of the large quantity of illegal drugs involved in the instant offense and the defendant's part in planning the delivery of the drugs. Nor is the defendant's sentence a purposeless and needless infliction of pain and suffering. When we view the defendant's sentence in light of the harm done to society by illegal and dangerous drugs, the sentence does not shock the sense of justice and is not excessive. This assignment of error is therefore without merit.

CONCLUSION
For the foregoing reasons, we affirm the defendant's conviction and sentence.
AFFIRMED.
NOTES
[1] Hernandez and Ortega were married at the time of the defendant's trial.