810 So.2d 1179 (2002)
STATE of Louisiana, Appellee,
v.
Larry Stinson SHARP, Appellant.
No. 35,714-KA.
Court of Appeal of Louisiana, Second Circuit.
February 27, 2002.
Rehearing Denied March 28, 2002.
*1183 Louisiana Appellate Project, by J. Wilson Rambo, Monroe, for Appellant.
Larry Stinson Sharp, In Proper Person.
Richard Ieyoub, Attorney General, Paul J. Carmouche, District Attorney, Tommy J. Johnson, Traci Ann Moore, Assistant District Attorneys, for Appellee.
Before NORRIS, KOSTELKA and DREW, JJ.
KOSTELKA, J.
After an eleven-one jury convicted Larry Stinson Sharp ("Sharp") as charged with second degree murder, La. R.S. 14:30.1, he received a mandatory life sentence at hard labor without benefit of parole, probation or suspension of sentence.[1] He appeals his conviction and sentence.[2] We affirm.

FACTS
On March 12, 2000, Marcio Stanford ("Marcio") and Joni[3] Bumgarner Sanders ("Joni") visited the Vivian, Louisiana home of Ada Stanford ("Ada"), Marcio's mother, where they assisted her with chores. Joni and Sharp were involved in a romantic relationship until January of 2000 when she began dating Marcio. In the late afternoon of March 12th, as Ada and Marcio were working on a fence, and Joni was doing laundry, Sharp drove up. After a very brief conversation, Sharp asked Marcio if Joni was there and if he could talk to her. After Marcio responded affirmatively, Sharp drove to the back of the house to a location where Marcio and Ada could not see him. Thereafter, Marcio and Ada heard two gunshots and began running toward the back of the house. At that point, Sharp began backing out of the driveway as Ada yelled at him to stop. When Sharp stopped the truck, Ada saw him point a shotgun out of the window. Sharp then fired at Marcio and Ada, hitting Marcio's truck. Marcio retrieved a gun from his truck and returned fire toward Sharp as Sharp backed out of the driveway onto the main roadway. Ada and Marcio hurried to find Joni who had been fatally shot. She was lying face down in water running from hot water pipes which had been hit by Sharp's gunfire. Marcio pulled her from the water flow and covered her with a sheet.
Later the same evening, the Caddo Parish Sheriff's office received a report of a gunshot fired in the vicinity of a nearby bar. When deputies arrived, they found Sharp lying near a pay phone with a self-inflicted gunshot wound to the chest. Sharp was arrested and transported to LSU Medical Center for treatment.

DISCUSSION
Sharp first contends that the evidence was insufficient to convict him of second degree murder.[4]
*1184 A claim of insufficient evidence is better addressed by a motion for post-verdict judgment of acquittal filed in the trial court. See, La.C.Cr.P. art. 821. However, this court has held that it may also be raised by assignment of error on appeal. State v. McKinney, 31,611 (La. App.2d Cir.02/24/99), 728 So.2d 1009.[5]
Under Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979), the proper standard of appellate review for a sufficiency-of-evidence claim is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. State v. Bosley, 29,253 (La.App.2d Cir.04/02/97), 691 So.2d 347, writ denied, 97-1203 (La.10/17/97), 701 So.2d 1333.
The Jackson standard is applicable in cases involving both direct and circumstantial evidence. An appellate court reviewing the sufficiency of evidence in such cases must resolve any conflict in the direct evidence by viewing that evidence in the light most favorable to the prosecution. When the direct evidence is thus viewed, the facts established by the direct evidence and inferred from the circumstances established by that evidence must be sufficient for a rational trier of fact to conclude beyond a reasonable doubt that the defendant was guilty of every essential element of the crime. State v. Sutton, 436 So.2d 471 (La.1983).
This court's authority to review questions of fact in a criminal case is limited to the sufficiency-of-the-evidence evaluation under Jackson and does not extend to credibility determinations made by the trier of fact. State v. Williams, 448 So.2d 753 (La.App. 2d Cir.1984). A reviewing court accords great deference to a jury's decision to accept or reject the testimony of a witness in whole or in part. Bosley, supra. In the absence of internal contradiction or irreconcilable conflict with physical evidence, one witness's testimony, if believed by the trier of fact, is sufficient support for a requisite factual conclusion. State v. Bellamy, 599 So.2d 326 (La.App. 2d Cir.1992), writ denied, 605 So.2d 1089 (La.1992).
Second degree murder is the killing of a human being with the specific intent to kill or inflict great bodily harm. La. R.S. 14:30.1.
Manslaughter is a homicide which would be first or second degree murder, but the offense is committed in sudden passion or heat of blood immediately caused by provocation sufficient to deprive an average person of his self-control and cool reflection. La. R.S. 14:31. The existence of sudden passion and heat of blood are not elements of the crime of manslaughter, but, rather, are factors in the nature of a defense which may reduce the grade of homicide. State v. Mackens, 35,350 (La.App.2d Cir.12/28/01), 803 So.2d 454. A defendant who shows by a preponderance of the evidence that these mitigatory factors are present is entitled to a manslaughter verdict. State v. Jackson, 34,076 (La.App.2d Cir.12/06/00), 774 So.2d 1046. However, the defendant is not obligated to establish the factors affirmatively; instead the jury may infer them from the overall evidence presented. Id. The reviewing court's function is to determine whether a rational trier of fact, viewing the evidence in the light most favorable to the state, could have found that the mitigatory factors were not established by a preponderance of the evidence. Id.
*1185 On appeal, Sharp does not contest the fact that he shot Joni. He contends, however, that his mental condition caused him to act in a state of rage or sudden passion which deprived him of his self-control and cool reflection so as to support only a manslaughter conviction.[6]
At trial, the jury heard evidence from the deputies who investigated the case. On the evening of March 12, 2000, Sergeant Gary Frake ("Frake") received a call regarding a man with a gunshot wound. He and Caddo Sheriff's Office investigator, John May ("May"), went to the scene where they discovered a white male lying on the ground. Deputy James McLamb, II ("McLamb") had previously arrived at the scene and informed May and Frake that the individual was Sharp and that he had a chest wound. Earlier, at 6:00 p.m., May had been called to the scene of Joni's shooting where he had learned of Sharp's involvement. Accordingly, May advised Sharp of his Miranda rights and asked him if he had shot Joni and himself. Sharp responded affirmatively to both questions and further explained that he had shot Joni because she ran off with his best friend. Sharp also indicated that he had attempted to shoot himself with the same gun that he had used to shoot Joni. Frake indicated that he found the gun approximately 200 feet from Sharp's location. It was a 12-gauge pump shotgun. He also retrieved several notes from Sharp's pockets. The deputies located the truck Sharp drove in the vicinity of the bar where Sharp was found. It had several bullet holes in the bed of the truck and a hose connected to the tailpipe.
While Sharp remained in the hospital for treatment, May obtained two statements from him on March 14th and 16th. May taped only the March 16th statement after advising Sharp of his rights. The jury heard the recorded statement in which Sharp stated the following: That on the Friday night before the shooting, Joni called him and wanted him to meet her at the Malibu Beach Club in Shreveport because she needed to see him. From his caller identification device, Sharp realized that Joni was calling him from Marcio's house. He had known that she was seeing someone and this confirmed that it was Marciohis friend. Although he did not meet Joni on that night, he got up on Saturday morning and went to Nacogodoches, Texas, to visit Sarah Gresham ("Gresham"), a girlfriend. He helped Gresham do yard work and then went to a club to have a few beers. He returned to Gresham's at approximately 12:30 a.m. and tried to sleep. During the night, Sharp decided to kill himself because he loved Joni. He got up the next morning and told Gresham that he was going to get breakfast. Instead, Sharp went to Marshall, Texas to the home of a friend named Jeff Palmer ("Palmer") who Sharp knew was not at home. He entered Palmer's back door and stole a shotgun. Thereafter, Sharp went to a deer lease camp where he planned on killing himself. On the way there, he decided he needed to talk to Marcio and Joni. Sharp then called his friend, Tim Cloninger ("Cloninger"), and asked if he could borrow his truck. As Sharp waited for Cloninger at the deer camp, he wrote notes to his ex-wife and daughter. Sharp explained that he wanted somebody else's truck because he was driving without a license and feared that authorities would recognize his truck and take him to jail. Because Sharp did not know where Marcio lived, he drove to *1186 Smithland and Jefferson, Texas, where he obtained a can of gasoline. He parked down the road from Joni's mother's house and made sure no one was home. He then doused the house with gasoline and set it afire. Sharp hid the gas can and went back to the truck. He drove back to Smithland and asked several people where Marcio lived. He eventually found Ada's home and saw Marcio and Ada in the yard. Sharp also saw Joni going to the back of the house. He entered the yard and asked Marcio why he had not returned his telephone calls. Sharp indicated that he told Marcio he was not angry with him. Sharp admitted that when Marcio responded that he did not have time to return his telephone calls, he then wanted to kill Marcio but did not because Ada was standing next to Marcio. Sharp stated that he had consumed six or seven Valium tablets at about 2:00 that afternoon. When he saw Joni go toward the back of the house, he decided that he was going to kill her, Marcio and himself. Sharp went to the back of the house, opened the door to a screened porch where Joni was located and shot her twice. As Ada and Marcio ran back toward Sharp, he shot at Marcio. Marcio then fired several shots at Sharp as he left, hitting the truck Sharp was driving. A short time later, Sharp attached a piece of hose, which he had obtained at Palmer's house, to the tailpipe of the truck and started the truck in an attempt to commit suicide. When the radiator overheated, however, the truck stopped. Sharp then walked to the bar where he was later found. He intended to use a phone there to call his daughter to tell her goodbye but did not because it was too close to the road. He attempted to place the shotgun under his throat but could not reach the trigger. He then found a stick and used it to pull the trigger. The gun prematurely fired, striking him in the chest and knocking him backwards.
May indicated that in the March 14th statement, Sharp stated that he had decided to kill Mario and Joni while he waited for Cloninger to arrive at the deer lease. May confirmed that a hose was hooked up to the truck.
The jury also heard the testimony of Ada and Marcio which corroborated Sharp's statements and the deputies' testimony as it related to the events leading up to and following Joni's death. At trial, Gresham's testimony was also consistent with these accounts of the events.
The jury also listened to expert testimony regarding Sharp's mental condition at the time of the shooting. Dr. Mark Vigen ("Dr.Vigen") was qualified as an expert in general and forensic psychology. Dr. Vigen opined that Sharp suffered from a mental disorder called narcissistic personality disorder and chemical dependency on drugs and alcohol. Dr. Vigen explained that personality disorders are deeply ingrained patterns of maladaptive behavior which cause distressing and dysfunctional relationships. He testified that in his opinion, Sharp felt lonely and rejected. This was caused by the lack of affirmation or emotional connection early in life. Dr. Vigen explained that the narcissistic personality becomes very hurt by rejection and felt that Sharp was surprised, shocked, hurt and enraged by Joni's behavior with Marcio. The doctor opined that Sharp's killing of Joni was a product of his rage and characterized Sharp's behavior at the time of the murder as "stimulus overload." He opined that Sharp was in a state of confusion, overloaded with anxiety, fear, anger, panic and despondency. He characterized Sharp's state as "emotionally labile," and "cognitively" and "emotionally" confused. At the time of the killing, Sharp's ability to control his impulses was poor. Vigen stated that Sharp was able to at times distinguish between *1187 right and wrong but explained that at the time of the shooting, his judgment and impulse control were impaired and he was disinhibited. At the time of the shooting, Dr. Vigen could not state that Sharp was in a psychotic state or responding to delusions to the point that he did not know right from wrong. He explained that Sharp's state was analagous to the reaction of a car driver when bees or wasps enter the car through a window. He stated that this is an example of stimulus overload and that although the person is in a state of anxiety and panic, he may still be able to execute his functions.
Similarly, Dr. George Seiden ("Dr.Seiden"), an expert in psychiatry and forensic psychiatry, diagnosed Sharp with alcohol dependence and adjustment disorder with depressed mood. He agreed that Sharp suffered from narcissistic personality disorder. However, Dr. Seiden testified that the anger resulting from the disorder did not diminish Sharp's capacity to control his behavior. He felt that Sharp had carried out his acts over an extended period of time and calculated his actions. Dr. Seiden felt that this was demonstrated by Sharp's failure to shoot Marcio because Marcio's mother was nearby. He felt that Sharp did not harm Marcio's mother because she was not the object of Sharp's rage. Dr. Seiden testified that he did not feel Sharp was in a senseless rage, but that "[h]e was angry and he was going to get the people he was angry at." Dr. Sieden concluded that Sharp engaged in calculated thinking and reasoning behavior. He felt that Sharp experienced rage when, shortly before he killed Joni, he found out about the relationship between Marcio and Joni. Sharp's rage persisted over time as he laid out his planto get a gun and a truck, set fire to Joni's mother's house and find Marcio and Joni. He disagreed with Dr. Vigen because he felt that Sharp's actions demonstrated calculated, reasoned behavior and that Sharp could distinguish between right and wrong. He concluded that although Sharp's thinking was unreasonable to the normal person, he was capable of understanding the consequences of his thoughts and actions and could have decided not to shoot Joni.
We find the verdict supported by this evidence and testimony. In concluding that Sharp had failed to prove the mitigating factors of sudden passion or heat of blood by a preponderance of the evidence, the jury obviously accepted the expert testimony of Dr. Seiden and rejected Dr. Vigen's view. Of course, the trier of fact is free to accept or reject, in whole or in part, the testimony of any witness. State v. Williams, XXXX-XXXX (La.App. 1st Cir.12/28/01), 804 So.2d 932. A reviewing court accords great deference to a jury's decision to accept or reject the testimony of a witness. State v. Ratliff, 35,144 (La. App.2d Cir.09/26/01), 796 So.2d 101. From Dr. Seiden's testimony that Sharp's disorder did not diminish his capacity to control his behavior, the jury's conclusion was a reasonable one. With that testimony and the evidence showing Sharp's day long search for Joni and Marcio, which included burning Joni's mother's house, breaking into a house to steal a gun, trading vehicles to avoid detection, and his calm conversation with Marcio before driving to the back of the house and confronting Joni with a loaded shotgun, the jury could have also reasonably concluded that the state proved beyond a reasonable doubt Sharp actively desired to kill Joni rather than killing himself in front of her. In these circumstances, the evidence is sufficient to support the second degree murder verdict.

Motion to Suppress
Sharp secondly contends that the trial court erred in denying his motion to suppress his March 12th and 14th statements and that this court erred in reversing the *1188 trial court regarding his March 16, 2002 statement.
The record shows that on June 1, 2000, Sharp filed a motion to suppress the statements made by him on March 12, 2000, at the time of his arrest, and on March 14th and 16th while he was hospitalized for his chest wound. Specifically, Sharp contended that the first two statements should have been suppressed because they were obtained without a clear waiver of his rights to remain silent and to have counsel present during questioning. He also argues that because he was either suffering from the effects of a gunshot wound or under the influence of prescription drugs, alcohol and suffering from depression, he was unable to knowingly and voluntarily waive his rights. He claims the third statement was obtained in violation of his Sixth Amendment right to the assistance of counsel.
After a hearing on the motion to suppress, the trial court denied the motion as to the March 12, 2000 and March 14, 2000 statements to police but took the issue of suppression of the March 16, 2000 statement under advisement. In a written ruling on October 17, 2000, the trial court again found the March 12, 2000 and the March 14, 2000 statements to the police admissible but suppressed the March 16, 2000 statement after concluding Sharp had invoked his right to counsel prior to giving the statement.
On November 2, 2000, this court exercised supervisory review and reversed the ruling of the trial court regarding the March 16, 2000 statement finding that "[t]he district court erred in ordering suppression of defendant's recorded statement of March 16, 2000."

March 16th Statement
At the hearing on the motion to suppress, the following evidence was presented regarding the March 16th statement. On March 16, 2000, investigator May and Caddo Parish District Attorney's Office investigator Ricky McDonald ("McDonald") went to Sharp's hospital room for a second time to conduct a taped interview. At that time, Sharp was awake and alert and the investigators informed him that they were there to make a recorded statement. Sharp indicated that his lawyer had been there the day before and "he wanted to give a statement but his lawyer wanted to meet with him first." Sharp provided the investigators with the name of a lawyer from Marshall, Texas.
When May called the lawyer's office, he was not in. Instead, May spoke with Jennifer Jeffries ("Jeffries"), another lawyer in the firm who told him that the other lawyer represented Sharp in a Texas civil matter but that they had not been retained to represent him on the criminal charges pending in Louisiana. May testified that Jeffries told him that he could interview Sharp if Sharp was willing to talk to him.
Jeffries testified that she had met with Sharp on March 15, 2000 regarding his Texas divorce. She knew he had been charged with homicide. Jeffries testified that she told May she did not know whether her firm represented Sharp in the Louisiana criminal matter. She acknowledged that neither she nor the other attorney were licensed to practice law in the state of Louisiana. Jeffries further testified that on March 16, 2000, May called her firm looking for the other attorney and that she took the call. She testified that May was trying to determine if the other attorney would be representing Sharp in the Louisiana criminal proceedings. She told May that she did not represent the defendant and that she did not know if the other lawyer had intentions to try to aid Sharp. Jeffries testified that she did not tell May that it was okay to talk to Sharp if Sharp was willing to do so. Instead, she recalled telling the investigator that if *1189 Sharp had asked for an attorney, May knew the ramifications of going forward with questioning. Notably, Jeffries did not tell May to withhold questioning Sharp or ask to speak to Sharp before questioning.
After talking to Jeffries, May went back into the hospital room and told Sharp that counsel had said Sharp could talk to them if he wanted to. Sharp then gave the deputies the March 16, 2000 detailed recorded statement.
Both in his motion to suppress and on appeal, Sharp contends that the March 16, 2000 statement was obtained in violation of his constitutional rights because he had invoked his Sixth Amendment right to counsel prior to giving the statement. Of course, pursuant to our supervisory review power, we have previously reversed the trial court suppression of the March 16, 2000 statement. Nevertheless, this issue can appropriately be reconsidered on appeal. The standard of review was stated by the Louisiana Supreme Court in State v. Humphrey, 412 So.2d 507 (La.1982):
When this court considers questions of admissibility of evidence in advance of trial by granting a pretrial application for supervisory writs (rather than deferring judgment until an appeal in the event of conviction), the determination of admissibility does not absolutely preclude a different decision on appeal, at which time the issues may have been more clearly framed by the evidence adduced at trial. Nevertheless, judicial efficiency demands that this court accord great deference to its pretrial decisions on admissibility, unless it is apparent, in light of the subsequent trial record, that the determination was patently erroneous and produced an unjust result....
A review of the subsequent trial record reveals no additional evidence regarding the taking of the March 16th statement than that which was reviewed by this court upon the writ application. In these circumstances, we conclude that Sharp has failed to demonstrate that the previous ruling was patently erroneous or produced an unjust result. It is therefore appropriate for us to accord great deference to our previous ruling and affirm that determination.

March 12th Statement
Sharp also contends that the March 12th and 14th statements should have been suppressed because the state failed to show a knowing, voluntary and intelligent waiver of his rights.
Before a confession can be introduced into evidence, it must be affirmatively shown that it was free and voluntary, and not made under the influence of fear, duress, intimidation, menaces, threats, inducements or promises. La. R.S. 15:451. The state must also establish that an accused who makes a statement during custodial interrogation was first advised of his Miranda rights. Mackens, supra. A trial court's findings regarding the admissibility of a confession are entitled to great weight and will not be disturbed unless unsupported by the evidence. Testimony of the interviewing police officer alone may be sufficient to prove that the statement was freely and voluntarily given. Id. Police testimony may overcome a defendant's claim that his statement was involuntary, because he suffered from a wound or lack of sleep. Id.
Although on appeal Sharp makes no specific argument for the suppression of the March 12th statement, in his motion to suppress, he claimed that the statement should not be admissible because at the time of the statement, he was suffering from the effects of the gunshot wound for which he was receiving treatment, under *1190 the influence of prescription drugs and alcohol and fearful of dying. At the hearing on the motion to suppress and at trial, May testified that he read Sharp his Miranda warnings prior to asking him any questions. He further indicated that Sharp expressed an understanding of his rights, was able to talk and was alert and conscious, although he was in pain. His tone of voice was normal. Sharp never lost consciousness. His speech was clear and he did not invoke any of his rights at that time. May indicated that McLamb had arrived before he did and had a towel applied to the wound. At the time of his arrival, May remembered that Sharp kept asking to let him die. May testified that no promises or threats were made to Sharp in order to secure a confession. May asked Sharp if he shot Joni and Sharp admitted to doing so because she left him for his best friend, Marcio. He also asked him if he had shot himself and Sharp said yes.
McLamb stated that when he arrived at the scene Sharp was conscious and coherent. He was able to and showed no hesitation in answering May's questions. McLamb recalled that Sharp told him he had a note in his pocketMcLamb found several. By shaking his head, Sharp indicated that he understood the rights May read to him.
Caddo Parish Sheriff's deputy Malcolm Laing ("Laing") was also at the scene of the first statement. Sharp was able to tell the officers who he was. Laing stated that he was able to understand Sharp who was alert and conscious. When Laing asked Sharp about the location of the gun, Sharp told him it was behind the bar. Laing heard McLamb ask Sharp what had happened and Sharp told him that he had shot himself in the chest. Sharp explained how the gun slipped and fired.
Frake was also present at the scene. He testified both at the hearing on the motion to suppress and trial that Sharp was conscious and alert and could answer each question posed to him. Frake heard May read Sharp his rights and Sharp respond that he understood them. Frake also heard May ask Sharp if he shot Joni and Sharp's affirmative response. He heard Sharp indicate that he used the same gun to shoot himself and Joni. When May asked Sharp why he had done it, Frake heard Sharp respond that he had done it because Joni ran off with his best friend. No threats were made to Sharp nor did the officers interfere with his treatment.
Connie Alamond ("Alamond"), a paramedic who assisted transporting Sharp to the hospital, testified that Sharp was able to talk and answer questions although he was upset. His vital signs and the cardiac monitor showed no signs of shock. He was given no prescription medication.
We conclude that this evidence is sufficient to demonstrate that Sharp's March 12, 2000 statement was freely and voluntarily given. The overwhelming testimony, including that of the interviewing officers, indicates that at all times Sharp was alert, conscious and could answer questions. The independent testimony of Alamond corroborated the officers' testimony regarding Sharp's consciousness and ability to understand questions and respond accordingly despite his pain from the chest wound. Moreover, Alamond's testimony shows that at no time was Sharp given prescription medication at the scene of the accident nor did he experience shock. His ability to answer questions appropriately and with clear speech otherwise demonstrates no incapacitating intoxication either from drugs or alcohol. In these circumstances, we find no error in the trial court's conclusion.

*1191 March 14th Statement

Regarding this statement, too, Sharp makes no specific argument on appeal in support of the suppression of this statement. In his motion to suppress the statement, he claimed that the statement was not freely and voluntarily given because at the time he had just undergone surgery and was under the influence of strong pain medication and was in a depressed state.
McDonald testified at the hearing on the motion to suppress and was also present at the taking of the March 14th statement. He stated that prior to taking the statement from Sharp, May once again read him his Miranda rights. At that time also, Sharp indicated an understanding of his rights. McDonald stated that based upon his experience with the sheriff's office, he did not feel Sharp was under the influence of medication at the time of the statement. In fact, McDonald knew that Sharp had refused some medication although he did not know what kind. McDonald testified Sharp was promised nothing in return for the statement, nor was he coerced or threatened.
May testified that he read Sharp his rights prior to taking his March 14th statement. Based upon his experience with the sheriff's office, he also did not believe that Sharp was under the influence of medication. Sharp's speech was very coherent, and although he appeared tired, he was able to give very detailed answers to May's questions. At no time during the interview did Sharp invoke his rights. May did not coerce or promise Sharp anything in exchange for the statement.[7] May felt that the statement was freely and voluntarily given.
We likewise find no error in the trial court's determination that this statement was admissible. The two interviewing officers' testimony supports the conclusion that Sharp was alert when questioned and gave specific and coherent responses to the questions asked of him. With Sharp presenting no evidence to show his being under the influence of pain medication, we conclude that the officers' testimony is sufficient to overcome Sharp's claim that the March 14th statement was not freely and voluntarily given because of the effects of prescription drugs. We, therefore, reject this argument.

Jury Instruction
Sharp argues that the trial court erred in failing to give the jury a proposed jury instruction which read as follows:
You the jury have the option to convict the defendant of a lesser offense, even though the evidence clearly and overwhelmingly supports a conviction of the charged offense. In all trials for murder, you may find a verdict of manslaughter.
The state and defendant have the right before argument to submit to the court special written charges for the jury. A requested special charge shall be given by the court if it does not require qualification, limitation, or explanation, and if it is wholly correct and pertinent. It need not be given if it is included in the general charge or in another special charge to be given. La.C.Cr.P. art. 807.
We find no error in the court's rejection of Sharp's special jury instruction. In State v. Porter, 93-1106 (La.07/05/94), 639 So.2d 1137, the court discussed the law of responsive verdicts as the statutory right to have the jury characterize a defendant's *1192 conduct as a lesser crime. The court further explained:
Treating the jury's prerogative to return a responsive verdict similar to the jury's power of nullification [a recognized practice which allows the jury to disregard uncontradicted evidence and instructions by the judge], this court has consistently held that the jury must be given the option to convict the defendant of the lesser offense, even though the evidence clearly and overwhelmingly supported a conviction of the charged offense.
Clearly, the first portion of the special instruction requested by Sharp was an attempt to reiterate more specifically the law of responsive verdicts to the jury, i.e., even if the evidence supports second degree murder, you can return a manslaughter verdict. Although arguably a technically correct statement, it is one which is integrated within the responsive verdict law. The jury was clearly instructed that it could return a verdict of guilty to the lesser included offense of manslaughter. To expound the responsive verdict law in the way that Sharp suggests would, in our opinion, require, at the very least, qualification and certainly explanation. There is no Louisiana jurisprudence supporting an argument that it is proper to instruct a jury that it can disobey law and reach a verdict inconsistent with the evidence. In this case, the general instruction was adequate to instruct the jury on this point. The trial judge obviously agreed. Finally, with the general instructions clearly listing manslaughter as a lesser included verdict to second degree murder, Sharp's request to inform the jury that in any second degree murder case you may return a verdict of manslaughter would have been redundant.

Excessive Sentence
In his excessive sentence claim, Sharp contends that the mandatory life sentence imposed upon him is excessive and that the trial court failed to adequately comply with La.C.Cr.P. art. 894.1.
The record shows that Sharp failed to file a motion to reconsider the imposed sentence. Accordingly, his sentence review is limited to the bare claim that the sentence is unconstitutionally excessive. State v. Mims, 619 So.2d 1059 (La.1993). In these circumstances, Sharp is precluded from raising the issue of the trial court's compliance with La.C.Cr.P. art. 894.1. Moreover, because the trial court imposed a mandatory sentence, a La. C.Cr.P. art. 894.1 articulation is not mandated and would be an exercise in futility. State v. Clem, 33,686 (La.App.2d Cir.11/01/00), 779 So.2d 763, writ denied, XXXX-XXXX (La.10/05/01), 798 So.2d 964; State v. Sims, 32,461 (La.App.2d Cir.10/27/99), 745 So.2d 151, writ denied, 99-3384 (La.05/12/00), 762 So.2d 11.
Of course, Sharp was convicted of second degree murder, La. R.S. 14:30.1, which carries a mandatory sentence of life imprisonment at hard labor, without benefit of parole, probation, or suspension of sentence.
In State v. Johnson, 97-1906 (La.03/04/98), 709 So.2d 672, in the context of habitual offender sentencing, the supreme court stated:
[T]o rebut the presumption that the mandatory minimum sentence is constitutional, the defendant must clearly and convincingly show that:
[he] is exceptional, which in this context means that because of unusual circumstances this defendant is a victim of the legislature's failure to assign sentences that are meaningfully tailored to the culpability of the offender, the gravity of the offense, and the circumstances of the case.
It is the legislature's prerogative to determine the length of a sentence imposed *1193 for the crimes classified as felonies, and the courts are charged with applying those punishments unless they are found to be unconstitutional. State v. Armstrong, 32,279 (La.App.2d Cir.09/22/99), 743 So.2d 284, writ denied, 99-3151 (La.04/07/00), 759 So.2d 92. Moreover, this court has afforded great deference to the legislature's determination of an appropriate minimum sentence. State v. Ruffins, 32,870 (La.App.2d Cir.12/10/99), 748 So.2d 614.
The argument set forth by Sharp that the mandatory life sentence for second degree murder is a violation of the prohibition against excessive punishment in the Louisiana Constitution has been repeatedly rejected. State v. Parker, 416 So.2d 545 (La.1982); State v. Brooks, 350 So.2d 1174 (La.1977); Ruffins, supra; Armstrong, supra; State v. Hereford, 518 So.2d 515 (La.App. 3d Cir.1987).
Moreover, in brief, Sharp makes no argument supporting the position that his particular circumstances present an exception to the constitutional application of this mandatory sentence. Accordingly, we cannot say that he has shown by clear and convincing evidence that he is the "exceptional" defendant for which downward departure from the mandatory provisions are required. The record shows that Sharp planned, calculated and carried out a brutal attack on an innocent, unarmed victim. In light of the crime committed, we cannot say that the imposed sentence shocks the sense of justice or is a needless or senseless imposition of pain and suffering. We, therefore, reject this argument.

Sharp's Pro Se Arguments
In his pro se brief, Sharp argues that the provisions of La. C.Cr.P. art. 782 and La. Const. art. 1, § 17 are unconstitutional because they prejudice those who have charges reduced from first degree to second degree murder.
La.C.Cr.P. art. 782 provides, in pertinent part:
A. Cases in which punishment may be capital shall be tried by a jury of twelve jurors, all of whom must concur to render a verdict. Cases in which punishment is necessarily confinement at hard labor shall be tried by a jury composed of twelve jurors, ten of whom must concur to render a verdict....
La. Const. art. 1, § 17 provides, in pertinent part:
(A) Jury Trial in Criminal Cases. A criminal case in which the punishment may be capital shall be tried before a jury of twelve persons, all of whom must concur to render a verdict. A case in which the punishment is necessarily confinement at hard labor shall be tried before a jury of twelve persons, ten of whom must concur to render a verdict....
In this case, the jury verdict was eleven to one in favor of the second degree murder conviction. Sharp argues that if he had been tried under his original charge of first degree murder, all twelve jurors would have had to concur in order to convict him. Because his charges were reduced to second degree murder, only ten of twelve had to concur to convict. This circumstance, Sharp argues, violates his right to due process and he requests that this court declare both La.C.Cr.P. art. 782 and La. Const. art. 1, § 17 unconstitutional.
Nevertheless, in Johnson v. Louisiana, 406 U.S. 356, 92 S.Ct. 1620, 32 L.Ed.2d 152 (1972) and Apodaca v. Oregon, 406 U.S. 404, 92 S.Ct. 1628, 32 L.Ed.2d 184 (1972), the United States Supreme Court upheld the validity of non-unanimous jury verdicts for twelve-person juries. Moreover, the Louisiana Supreme Court has consistently held La.C.Cr.P. art. 782 does not violate the Sixth or Fourteenth Amendments to *1194 the United States Constitution. See, State v. Green, 390 So.2d 1253 (La.1980); State v. Hodges, 349 So.2d 250 (La.1977), cert. denied, 434 U.S. 1074, 98 S.Ct. 1262, 55 L.Ed.2d 779 (1978); State v. Morgan, 315 So.2d 632 (La.1975). We, therefore, reject this claim.

Incomplete Record
Sharp contends that the trial transcript is incomplete because the voir dire transcript and the reading of the indictment has not been furnished.[8] Specifically, Sharp claims he is prejudiced by not having the voir dire transcript because his "[t]rial [c]ounsel used all peremptory challenges and had objected to several jurors that were allowed to remain on the jury." He also claims that without the transcript he cannot prepare his assignments of error. Sharp requests this court to supply or order a complete copy of the transcript including the voir dire.
We decline to grant this request. La.C.Cr.P. art. 914.1 provides in pertinent part that a transcript of the proceedings which does not relate to anticipated assignment of errors shall not be furnished to a party for purposes of appeal. Moreover, a defendant is not entitled to supplement the record on appeal unless he shows the court of appeal that the requested record is related to specific assignments of error. See, State v. Williams, XXXX-XXXX (La.App. 4th Cir.05/09/01), 788 So.2d 515. Neither Sharp nor his attorney have assigned as error any issues dealing with the jury voir dire. Sharp's generic allegations that his counsel used all of his peremptory challenges and his need for the transcript to prepare his assignments of error amounts to a fishing expedition and is insufficient to require a supplementation of the record.

Prejudicial Statements
Sharp next contends that the state made several prejudicial remarks in questions to the experts that improperly influenced the jury to reject his claim that he acted in "heat of passion." In brief, Sharp makes two specific claims of prejudice. The first refers to questioning by the state of Dr. Vigen and in context reads as follows:
Would you say that the way he was treated and his reaction to that would be in any way analogous to the kids who did the damage at Columbinethe trench coat Maffia kidswould they have been treated in the same manner that Mr. Sharp was and that's what led them to do what they did at Columbine High School?
The second refers to questioning directed to Dr. Seiden which presented a hypothetical question regarding the mental state of a rapist and his ability to control his behavior.
The remarks fail to fall within the mandatory mistrial provisions of La.C.Cr.P. art. 770. Nor are we convinced that the remarks influenced the jury and contributed to the verdict so as to warrant reversal of the conviction under La.C.Cr.P. art. 771. State v. Morris, 404 So.2d 1186 (La.1981). In context, both of these questions were raised as hypothetical situations to challenge Sharp's claim that he was not guilty by reason of insanity, or that because of mental disorders, he acted in sudden passion or heat of blood and was unable to control his behavior. Regarding the Columbine students, Dr. Vigen declined to express an opinion. Therefore, any prejudice caused by the question was cured by this response.
*1195 Nor has Sharp alleged or demonstrated how the hypothetical nature of the rapist question posed to Dr. Seiden specifically prejudiced his case. Without any specific allegation of prejudice or demonstration of how the statement affected substantial rights, we are without authority to reverse the conviction. La.C.Cr.P. art. 921.

Ineffective Assistance of Counsel
Sharp raises seven instances in support of his claim of ineffective assistance of counsel.
Ordinarily, claims of ineffective assistance of counsel are more properly presented by application for post-conviction relief. State v. Milligan, 28,660 (La. App.2d Cir.12/11/96), 685 So.2d 1127, writ denied, 97-0379 (La.06/30/97), 696 So.2d 1005; State v. Gipson, 28,113 (La.App.2d Cir.06/26/96), 677 So.2d 544, writ denied, 96-2303 (La.01/31/97), 687 So.2d 402. In the interest of judicial economy, however, the issues may be resolved on direct appeal if the record contains sufficient evidence pertaining to the matter. Id.
In alleging ineffective assistance of counsel, a defendant must satisfy a two-pronged test by showing, first, his attorney's performance to be so deficient as to deny him the counsel guaranteed by the Sixth Amendment; and second, that those errors are so serious as to deprive the accused of a fair trial, i.e., one with a reliable result. Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 2064, 80 L.Ed.2d 674 (1984). In order to prevail under the Strickland test, Sharp must demonstrate a reasonable probability that, but for counsel's unprofessional errors, the result of the proceedings would have been different. Gipson, supra. Also, a reviewing court must give great deference to the trial attorney's judgment, tactical decisions and strategy, strongly presuming the accordance of reasonable professional assistance. Strickland, supra; Gipson, supra.
After a review of the record before us, we conclude that we are unable to address four of Sharp's seven claims of ineffective assistance of counsel because the record contains little or no information regarding the allegations. These include his claims regarding the failure of defense counsel to call as witnesses Dr. Paul Ware, a Dr. Herrin and a Westy Meisenheimer and the claimed omission by his trial counsel regarding an intoxication defense.
Nevertheless, the record is adequate to review the remaining three claims. Initially, Sharp contends that his counsel's failure to file writs to the supreme court relevant to the admissibility of the March 16th, 2000 statement violated his right to the effective assistance of counsel. We cannot agree. Obviously, trial counsel made the decision not to pursue the issue of the admissibility of the March 16th statement beyond the ruling of this court. However, even had the supreme court reversed this court and found the statement inadmissible, the remaining evidence was sufficient to support the jury verdict. This evidence included Sharp's two remaining statements as well as expert testimony. Under these circumstances, we cannot conclude that the exclusion of the March 16th statement would have produced a different verdict. Accordingly, any error in counsel's decision was harmless.
Sharp also contends that his trial counsel's failure to object to the introduction of other crimes evidence, namely arson, resulted in ineffective assistance of counsel. We are constrained, however, to reject this argument. Although generally inadmissible, evidence of other crimes, wrongs or acts may be introduced when it relates to conduct that constitutes an integral part of the act or transaction that is the subject of the present proceedings. La. C.E. art. 404(B)(1); State v. Coates, *1196 27,287 (La.App.2d Cir.09/27/95), 661 So.2d 571, writ denied, 95-2613 (La.02/28/95), 668 So.2d 365. In such cases, the purpose served by admission of other crimes evidence is not to depict the defendant as a bad man but rather to complete the story of the crime on trial by proving the immediate context of happenings near in time and place. State v. Colomb, 98-2813 (La.10/01/99), 747 So.2d 1074. The concomitant other crimes do not affect the accused's character, because they were done, if at all, as parts of a whole; therefore, the trier of fact will attribute all of the criminal conduct to the defendant or none of it. And, because of the close connection in time and location, the defendant is unlikely to be unfairly surprised. State v. Wafer, 31,078 (La.App.2d Cir.09/23/98), 719 So.2d 156, writ denied, 99-1114 (La.10/01/99), 747 So.2d 1137. In this case, the alleged arson clearly formed an integral part of the event leading up to Joni's killing. Accordingly, counsel's failure to object to its mention in Sharp's statements was supported by this jurisprudence and an appropriate trial strategy.
Sharp also raises the issue of his trial counsel's failure to object to the personal opinions of Dr. Seiden in violation of La. C.E. art. 704. Indeed, La. C.E. art. 704 provides that an expert witness shall not express an opinion as to the guilt or innocence of the accused. Nevertheless, that provision also allows testimony in the form of an opinion which embraces an ultimate issue to be decided by the trier of fact. Moreover, La. C.E. art. 704 allows an expert to render an opinion to assist the trier of fact to understand the evidence or determine a fact at issue. We have reviewed the seven responses from Dr. Seiden which Sharp contends violate the provisions of La. C.E. art. 704 and conclude that the statements formed integral parts of his ultimate opinion as to the mental state of Sharp at the time of the shooting and his ability to control his behavior and understand the consequences of that behavior. This opinion evidence was essential to prove the issue of Sharp's sanity at the time of the offense and even his manslaughter claim and were, therefore, appropriately admitted into evidence. Accordingly, we find no merit to this portion of the claim.

CONCLUSION
For the foregoing reasons, we affirm Sharp's conviction and sentence.
AFFIRMED.
NORRIS, C.J., concurs with written reasons.
NORRIS, C.J., concurring.
I respectfully concur, questioning only the majority's treatment of the March 16 statement to Deputy May.
To establish the admissibility of a statement made by the accused during custodial interrogation, the State must prove that he was advised of his Miranda rights and that he waived them. Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966); State v. Brooks, 505 So.2d 714 (La.1987), cert. denied 484 U.S. 947, 108 S.Ct. 337, 98 L.Ed.2d 363 (1987). The determination that a statement is admissible is within the trial court's discretion, and it should not be disturbed on appeal unless it is not supported by the evidence. State v. Brooks, supra; State v. Koon, 31,177 (La.App. 2 Cir. 2/24/99), 730 So.2d 503.
The trial judge received conflicting testimony as to whether Sharp waived his right to counsel on March 16. From his hospital bed, Sharp told Deputy May that he was represented by a Texas attorney named Moran. Deputy May testified that he then tried to phone Moran but reached Moran's associate, Ms. Jeffries. According to May, Ms. Jeffries said he could interview Sharp *1197 if Sharp was willing to talk. However, Ms. Jeffries testified that when May phoned, she replied she did not know if Moran was representing Sharp in the criminal matter; that she needed to ascertain this from Moran; and that her "understanding" was that May would not question Sharp until she got this information and relayed it to May. On this conflicting evidence, I would defer to the trial court's finding that Sharp did not waive his right to counsel and that this statement should be suppressed.
Nonetheless, the erroneous admission of a confession into evidence is a trial error which is subject to harmless error analysis. State v. Tart, 93-0772 (La.2/9/96), 672 So.2d 116, cert. denied 519 U.S. 934, 117 S.Ct. 310, 136 L.Ed.2d 227; State v. Coates, 27,287 (La.App. 2 Cir. 9/27/95), 661 So.2d 571, writ denied 95-2613 (La.2/28/96), 668 So.2d 365. The evidence of Sharp's guilt is overwhelming, including two other incriminating statements, the eyewitness testimony of the Stanfords, and expert testimony of Drs. Seiden and Vigen. There is no reasonable possibility that admitting the March 16 statement contributed to the verdict. For these reasons, I concur.

APPLICATION FOR REHEARING
Before NORRIS, C.J., BROWN, STEWART, KOSTELKA and DREW, JJ.
Rehearing denied.
NOTES
[1] The record shows that Sharp was initially charged by grand jury indictment with first degree murder. However, a judgment quashing that indictment resulted in the present charges.
[2] On appeal, both Sharp and his counsel have filed briefs.
[3] Also spelled Joanie in the record transcript.
[4] Of course, when issues of both sufficiency of the evidence and trial errors are raised on appeal, the reviewing court should first address the sufficiency of the evidence claim. State v. Hearold, 603 So.2d 731 (La.1992).
[5] The record also shows that Sharp neglected to assert an insufficient evidence claim in his Motion for New Trial.
[6] On January 25, 2001, Sharp changed his not guilty plea to include not guilty by reason of insanity. On that same day, the court granted the state's motion for an independent mental examination which was conducted by Dr. George Seiden. Sharp does not assign as error the jury's failure to find him not guilty by reason of insanity.
[7] We note that May readily acceded to Sharp's request to delay taking a recorded statement.
[8] The record reveals that the indictment and Sharp's plea to same were indeed read to the jury at the start of trial.